GROVES v. COMMISSIONER OF INTERNAL REVENUE.

No. 4316.

Circuit Court of Appeals, Fourth Circuit.
June 6, 1938.

Rehearing Denied Oct. 4, 1938.

Hugh Satterlee, of Washington, D. C. (Albert S. Lisenby, of Philadelphia, Pa., Philip Zimet, of New York City, and Weill, Satterlee, Green & Morris, of Washington, D. C., on the brief), for petitioner.

Lucius A. Buck, Sp. Asst. to Atty. Gen. (James W. Morris, Asst. Atty. Gen., and Sewall Key, Sp. Asst. to Atty. Gen., on the brief), for respondent.

Before PARKER and NORTHCOTT, Circuit Judges, and HAYES, District Judge.

NORTHCOTT, Circuit Judge.

This is a petition to review a decision of the United States Board of Tax Appeals, involving income taxes of Wallace Groves, the petitioner, for the year 1930 in the amount of $137,449.57. The decision of the Board is reported in 36 B.T.A. 14.

The facts as found by the Board, about which there is no dispute, are as follows:

Petitioner, now a resident of New York, was in 1931 a resident of Baltimore, Maryland, where he filed his income tax return for 1930. In 1929 and into 1930 he was employed by First Industrial Bankers, Incorporated, engaged in the small loan business, at an annual salary of $12,000. That corporation was organized January 9, 1929, and its outstanding shares in 1930 were 54,000 common and 46,296 preferred. Of the 54,000 common, 18,000 were owned in equal shares by Belmont & Company, C. T. Williams & Company, and the Bankers Bond & Share Company, and 36,000 were owned by the First Industrial Holding Corporation, of which petitioner was an officer and director. Petitioner controlled the 36,000 shares held by the First Industrial Holding Corporation. In the hearing before the Board it was stated by petitioner's counsel that petitioner or his brother was the principal holder of the common shares of the First Industrial Holding Corporation.

In June, 1930, Arthur M. Greene, president of the Merchants & Manufacturers Securities Company, informally began negotiations with the petitioner looking to the acquisition of an interest in First Industrial Bankers, Incorporated, which resulted in an understanding that the Securities Company should acquire the 54,000 common shares for $1,000,000 and that First Industrial Bankers, Incorporated, should be merged with the Domestic Finance Corporation, subsidiary of the Securities Company. This understanding was then to be embodied in a written agreement, the mechanics and details of which were to be left entirely with the attorneys and accountants of Greene.

On June 20, 1930, petitioner caused the Firinbank Corporation to be organized, with an authorized capital stock of 5,000 shares of $10 par value.

On June 21, 1930, the Wagegro Corporation was organized with an authorized capital stock of $1,000,000, consisting of 5,000 class A and 5,000 class B shares, and petitioner and his brother immediately became directors. The petitioner owned and controlled both these companies.

On June 26, 1930, petitioner acquired options to purchase the 18,000 shares of First Industrial Bankers, Incorporated, from Belmont & Company, C. T. Williams & Company, and the Bankers Bond & Share Company, for $191,146.14.

The written agreement between Greene, representing the Securities Company, and the petitioner is dated June 27, 1930. It provided for the efforts of both to accomplish the merger of Domestic Finance and First Industrial Bankers, Incorporated, and set forth the details of the contemplated method of accomplishing such merger, among which was the acquisition by Domestic Finance of the 54,000 common shares of First Industrial Bankers, Incorporated, in exchange for 18,000 common shares of Domestic Finance. It provided that upon such merger petitioner would cause the said 18,000 common shares of Domestic Finance to be delivered to the Securities Company.

Petitioner agreed that on or prior to the date of closing the merger he would enter into an employment contract with the Securities Company or such other company or corporation as should have authority to engage in the small loan business, agreeing to devote his entire time and services for a period beginning on the date of the closing of the merger and ending January 1, 1933, for an annual salary of $18,000 and binding himself not to engage directly or indirectly in any business in competition with his employment or through its subsidiary or affiliated companies in the so-called small loan business for a period of

two years from and after the date of termination of the employment contract. The petitioner further agreed that upon the date of the closing of the contract and the payment of the consideration he would cause the employer interest in said contract to be vested in such corporation as the Securities Company would designate.

The written agreement stipulated that as payment for said 18,000 shares of common capital stock of Domestic Finance Corporation there would be paid the sum of $425,000 in cash, and as payment for the assignment of the employment contract there would be transferred 23,000 shares of class A stock of the Securities Company accompanied by the commitment of some person, firm, or corporation to purchase said 23,000 shares for the sum of $575,000, the Securities Company guaranteeing the performance of the obligations of said commitment.

On August 8, 1930, petitioner made an offer to the Firinbank Corporation of an option to purchase 36,000 shares of First Industrial Bankers, Incorporated, for $300,-000, an assignment of options held by him for the purchase of 18,000 such shares, and $5,000 in cash, in exchange for the issuance to him by the Firinbank Corporation of its 5,000 shares of capital stock. On the same date, this offer was accepted and the option covering 36,000 shares controlled by the petitioner was executed, and those options covering the 18,000 shares were assigned. On the same date, petitioner and the Firinbank Corporation agreed that petitioner would be employed by the corporation for the period August 15, 1930, to January 1, 1933, and would receive compensation of $1,500 a month, and would refrain from the small loan business, except in New Mexico and Arizona, for two years after termination of the employment.

At the first meeting of the directors of Wagegro, on August 8, 1930, petitioner was elected president and treasurer. At the meeting consideration was given to an offer dated August 8, 1930, of Arthur Greene to purchase from the corporation 5,000 of its class A shares for $500,000 in cash, the shares to be issued in Greene's name. The offer was accepted. Thereupon the directors immediately resigned, and Greene, Dallstream, and Dixon were elected in their places. Dallstream and Dixon were associates of Greene. Greene was now the Wagegro Corporation's sole shareholder. On August 11, 1930, the charter of the Wagegro Corporation was amended as the result of a stockholders' meeting at which the petitioner voted all the shares under a proxy from Greene.

On August 12, 1930, the Firinbank Corporation made a written offer to the Wagegro Corporation, which was accepted by the Wagegro Corporation on August 13, 1930, to assign to Wagegro the four options for the purchase of 54,000 shares of First Industrial Bankers, Incorporated, and its employment contract with the petitioner, in exchange for 5,000 class B shares of Wagegro to be issued to it. On August 13, 1930, the four options and the employment contract were assigned by the Firinbank Corporation to the Wagegro Corporation, and the Wagegro Corporation resolved to exercise the options to purchase the 54,000 shares of First Industrial Bankers, Incorporated, for approximately $500,000. The options were exercised and the 54,000 shares purchased by the Wagegro Corporation. At the same meeting, an offer was received from the Securities Company to issue to the Wagegro Corporation 23,000 shares of its class A stock "having a present fair market value of $575,000," in exchange for an assignment of the Firinbank-Groves employment contract; this offer was accepted, and the employment contract was assigned by the Wagegro Corporation to the Domestic Finance Corporation by direction of the Securities Company. The fair market value of the 23,000 class A shares of Securities Company was $575,000.

On August 15, 1930, Greene made an offer to Wagegro, which Wagegro accepted, to purchase 23,000 class A shares of the Securities Company for $575,000, payable $75,000, in cash and $500,000 by the surrender for retirement of 5,000 class A shares of the Wagegro Corporation. On the same date, August 15, 1930, the Securities Company made an offer to the Wagegro Corporation, which the Wagegro Corporation on that date accepted, to purchase the 54,000 common shares of First Industrial Bankers, Incorporated, for $425,-000 cash. Thereupon all the directors and officers, viz., Greene, Dallstream, and Dixon resigned and Groves, Sommerwerck, and Taylor were elected to their places. Sommerwerck and Taylor were associates of Groves.

In January, 1931, the employment contract, which was then still held by Domestic Finance Corporation, was substantially modified by the parties by a reduction in

the amount of compensation to $100 a year, a change in the services to be rendered by petitioner, and in the extent of the restriction against engaging in the small loan business.

The 54,000 shares of First Industrial Bankers, Incorporated, were not transferred to or acquired by the Securities Company in exchange for 18,000 shares of Domestic Finance Corporation as provided by the contract of June 27, 1930, between the Securities Company and the petitioner.

The Firinbank Corporation is still in existence and operates as a holding company. It still holds the Wagegro shares. The Wagegro Corporation is still in existence, having the same capital, and has been active as a finance company, buying securities, selling securities, and buying notes.

The Securities Company, on its income tax return for the fiscal year ended March 31, 1931, took a deduction of $151,315.80 as amortization of the Firinbank-Groves employment contract, computed upon a cost basis of $575,000 amortized over the period August 15, 1930, to January 1, 1933.

Petitioner owned all the stock of the Firinbank Corporation, which corporation in turn owned all the stock of the Wagegro Corporation.

The Commissioner of Internal Revenue, the respondent here, made a determination of petitioner's tax liability for the year 1930 fixing the deficiency at $173,699.57, based chiefly on the value as fixed by him of the 23,000 shares of the Securities Company stock, and upon appeal to the Board of Tax Appeals this deficiency was reduced to $137,449.57, the Board finding the value of the 23,000 shares of the Securities Company stock to be less than found by the respondent. The Board held that certain other items determined by the respondent were not correct charges but held that petitioner was properly chargeable with the tax on the $575,000 paid as consideration for the 23,000 shares turned over for petitioner's employment contract.

The sole question involved is whether the sum of $575,000 paid for the shares given in exchange for the employment contract, was taxable as income of the petitioner for the year 1930.

It is contended on behalf of the petitioner that the 23,000 shares of stock in question were not received by him personally, but we fail to see what difference this would make. The shares were received by a corporation owned and controlled absolutely by the petitioner, and the petitioner alone. It would be hard to find a more intricate or involved financial transaction than the one conceived and carried out by the petitioner in the instant case. A study of the circumstances as shown by the record leads to the inevitable conclusion that the petitioner upon arriving at an agreement with Greene with regard to the sale of the Industrial Company stock, realizing that he would have to pay a large income tax, set out to devise a scheme to escape at least a part of that tax. Shortly after negotiations were opened, and within the same month, he organized the Firinbank Corporation, in which he owned all the stock, and the next day he organized the Wagegro Corporation in which the Firinbank Corporation in turn held all the stock. In the same month (June 26, 1930) he acquired options on the rest of the stock in the Industrial Company and the next day, June 27, 1930, he entered into a written contract for the sale of all the Industrial Company stock for the price evidently already agreed upon but which provided that $425,000 of the $1,000,000 was to be paid for the stock and $575,000 the balance of the $1,000,000 was to be paid for the employer interest in a personal service contract which the petitioner entered into with the Firinbank Corporation, which was entirely owned by him. This personal service contract was assigned to another corporation, the Wagegro Corporation, also owned by the petitioner and was transferred for 23,000 shares of Securities Company stock which was sold back to the purchasing company for a previously agreed upon price of $575,000.

This personal service contract which Groves made with himself, as owner of Firinbank and immediately transferred to himself as owner of Wagegro, was but another step in the deliberately conceived scheme to escape taxation. At the time it was made Groves was free to contract direct with the Securities Company, if they wished to secure his services, and the contract entered into with so much formality was allowed to run only a short five months when it was set aside practically in its entirety.

There can be no doubt that the transactions shown here, intricate and involved as they were, were simply anticipatory arrangements for the deflection of income to be earned. Such arrangements must be dis-

regarded for the purposes of taxation. As was said by the Supreme Court in Stone v. White, 301 U.S. 532, 57 S.Ct. 851, 854, 81 L.Ed. 1265:

"It is in the public interest that no one should be permitted to avoid his just share of the tax burden except by positive command of law * * * ."

The fact that petitioner organized the two corporations, owned and controlled entirely by him, in anticipation of diverting to them the income he knew he would earn, instead of receiving these earnings himself, cannot avail him to escape a proper tax. A taxpayer cannot enter into a contract under which he assigns to another income to be earned and thereby shift the tax on that income from himself. Here the assignment was made to a corporation the petitioner himself controlled. As was said by Mr. Justice Holmes in Lucas v. Earl, 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731:

"But this case is not to be decided by attenuated subtleties. It turns on the import and reasonable construction of the taxing act. There is no doubt that the statute could tax salaries to those who earned them and provide that the tax could not be escaped by anticipatory arrangements and contracts however skilfully devised to prevent the salary when paid from vesting even for a second in the man who earned it. That seems to us the import of the statute before us and we think that no distinction can be taken according to the motives leading to the arrangement by which the fruits are attributed to a different tree from that on which they grew."

Again in Corliss v. Bowers, 281 U.S. 376, 50 S.Ct. 336, 74 L.Ed. 916, Mr. Justice Holmes said (page 337):

"The income that is subject to a man's unfettered command and that he is free to enjoy at his own option may be taxed to him as his income, whether he sees fit to enjoy it or not."

The fact that petitioner left the money with his Wagegro Corporation, pending this litigation, cannot operate to exempt him from the payment of the tax. In Burnet v. Sanford & Brooks Company, 282 U.S. 359, 51 S.Ct. 150, 75 L.Ed. 383, opinion by Mr. Justice Stone, the court said (page 152):

"It is the essence of any system of taxation that it should produce revenue ascertainable, and payable to the government, at regular intervals. Only by such a system is it practicable to produce a regular flow of income and apply methods of accounting, assessment, and collection capable of practical operation."

As was decided in Helvering v. Gordon, 8 Cir., 87 F.2d 663, 667:

"The government cannot be controlled by the manipulations of the taxpayer's accounts, nor by the shifting of funds from one personally dominated corporation to another, in the enforcement of the tax laws. It is the Commissioner's duty to look through forms to substance and to assess the earnings of corporations to their shareholders in the year such earnings are distributed."

It is contended on behalf of the petitioner that the making of the contract for personal services was a device planned by the attorneys and accountants in the employ of Greene to enable him (Greene) and his associates to escape taxation and that this contract was not what it purported to be; and that the $575,000 paid for the assignment of the employer interest in the contract was in reality a part of the agreed purchase price for the Industrial Bankers stock. The petitioner was a party to this contract, gave his full approval and his assent to the arrangement as conceived and carried out and will not now be heard to deny that the contract was what it purported to be. Having entered into a scheme concocted for the sole purpose of perpetrating a fraud upon the government by the evasion of a proper tax, the petitioner is estopped from denying the bona fides of the contract, when it suits his purpose to do so, in seeking to evade taxation.

The various steps taken by the petitioner were anticipatory arrangements for the deflection of income. The Wagegro and Firinbank Corporations were not created by the petitioner for the purpose of carrying on any real or actual business in the ordinary way but only in furtherance of the scheme to evade taxation. The Board was justified in looking through the form to the substance of the various transactions arranged and carried out by the petitioner. The petitioner in effect received and still enjoys the possession of the proceeds of the sale of the 23,000 shares of the Securities stock and should be taxed for the $575,000 as income for the year 1930.

Affirmed.

184

On Petition for Rehearing.

PER CURIAM.

The petition for rehearing presents no point not already fully considered. The only point having any semblance of merit is that taxpayer should be charged only with the difference between the amount received for the stock of the First Industrial Bankers and its cost; but a sufficient answer to this is that the point was not made before the Board of Tax Appeals or in the petition for review, and there is no finding by the Board as to the cost of the stock. Having elected to try his case before the Board on the theory that he received no income whatever as a result of the complicated transactions, set forth in the record, taxpayer should not be allowed to change his position on the hearing before this court.

Denied.