## COMMISSIONER OF INTERNAL REVENUE v. GRIFFITHS.

### No. 6752.

Circuit Court of Appeals, Seventh Circuit.

Feb. 25, 1939.

Rehearing Denied April 15, 1939.

James W. Morris, Asst. Atty. Gen., and J. Louis Monarch, Joseph M. Jones, Sewall Key, J. P. Wenchel, Charles H. Curl, and Ellis N. Slack, Sp. Assts. to Atty. Gen., for petitioner.

Delbert A. Clithero, Herman A. Fischer, and Carlton L. Fischer, all of Chicago, Ill., for respondent.

Before SPARKS, MAJOR, and TREANOR, Circuit Judges.

---

MAJOR, Circuit Judge.

This is a petition for review of a decision of the United States Board of Tax Appeals, entered March 21, 1938, denying a deficiency of $40,913.31 as determined by the Commissioner in respondent's income tax for 1933.

The facts, as found by the Board, and not in dispute, are as follows: In 1926, respondent purchased from or through Robert D. Lay at a cost of $100,000, 5,000 shares of the capital stock of the Oakridge Cemetery Corporation. October 30, 1931, the same shares of stock were sold to the John Griffiths Investment Trust for $7,500. November 16, 1931, the stock was repurchased from said investment trust for $7,000, and again sold to the same trust on December 30, 1931 for $7,000. For the year 1931, respondent, in his income tax return, claimed and was allowed a deduction of $92,500 as a loss from these transactions.

Respondent, about January 1, 1933, discovered that Lay had defrauded him in the transaction in 1926, wherein the shares of stock in question were purchased. He consulted and employed Harry Markheim, an attorney, who investigated and commenced negotiations to effect a settlement. On January 9, 1933, respondent was advised by his counsel that Lay would probably make a settlement in the next two or three days. At that time he was also informed that his claim against Lay consisted of a cause of action involving a breach of trust in the nature of a tort claim and that it would be essential for him to reacquire the stock in order to unite the ownership of the stock with the claim. During this same conversation, respondent was advised by his counsel that he might effect a postponement of the time of paying, as well as limit the amount of income taxes on the profit which would result from a settlement and return of the stock to Lay by organizing an investment company to which he would sell the stock and cause of action on an installment basis, permitting the investment corporation to make the settlement with Lay. Respondent had theretofore given thought to the formation of such an investment corporation and on January 9, 1933, instructed his counsel to organize the same.

As a result, arrangements were made by telephone through the instrumentality of the Corporation Trust Company for the organization of the G. W. G. Corporation, which was effected, on the following day, under the laws of Delaware, with three of Markheim's associates as directors. Respondent paid $1,000 for all the capital stock of the corporation. A formal meeting was held in Delaware at 9 A. M. on the morning of the 10th, and a meeting in the office of Markheim in Chicago at 10 the same morning. On the afternoon of that day, Markheim was definitely advised that Lay was going to pay. The directors of the corporation, on January 10th, approved a proposition made by the taxpayer and entered into a written agreement.[1] On this day, also, respondent purchased the

---

[1] "This Memorandum of Agreement, Made this tenth day of January, 1933, between George W. Griffiths, of Chicago, Illinois, and G. W. G. Corporation, a Delaware corporation.

"Witnesseth:

"First: Said George W. Griffiths hereby sells to said G. W. G. Corporation Five Thousand (5,000) shares of the capital stock of Oakridge Cemetery Corporation, an Illinois corporation, and assigns to said corporation any rights said George W. Griffiths may have against Robert D. Lay to require said Robert D. Lay to purchase said stock, and said G. W. G. Corporation hereby purchases said Five Thousand (5,000) shares of the capital stock of said Oakridge Cemetery Corporation, and hereby agrees to pay therefor the sum of Eighty-five Thousand Dollars ($85,000.00), and to assume and perform the obligations of said George W. Griffiths to E. H. Harrison to pay said E. H. Harrison Fifteen Per Cent (15%) of the amount of money (after the payment of all expenses) received on the sale of said stock to said Robert D. Lay, and in consummation of said sale said George W. Griffiths has, concurrent with the execution hereof, delivered to said corporation, receipt whereof by said corporation is hereby acknowledged, Certificate No. 1003, evidencing Five Thousand (5,000) shares of said stock, standing in the name of John Griffiths Investment Trust, and endorsed by the Trustees of said John Griffiths investment Trust in blank.

"Second: Said G. W. G. Corporation agrees to pay said sum of Eighty-five Thousand Dollars ($85,000.00) as follows: The sum of One Thousand Dollars ($1,000.00) concurrently with the execution hereof, receipt whereof is hereby acknowledged; the sum of Eleven Hundred Twenty-five Dollars ($1,125.00) on January 15, 1933; and the sum of Twenty-one Hundred Twenty-five Dollars ($2,-

stock from the John Griffiths Investment Trust, paying $8,000 therefor, and received a certificate endorsed in blank.

On January 11, 1933, the directors of the G. W. G. Corporation approved the sale of the corporation stock to Lay for $100,000 and authorized respondent "either in his own name or in the name of the corporation" to do whatever might be necessary or desirable to consummate the sale. Respondent, as treasurer of the corporation, was also authorized to invest the proceeds of the sale in a manner consistent with the corporate purposes as stated in the charter.

There were matters in dispute between respondent and Lay other than the stock in question, which were all included in a settlement made on January 11, 1933. At that time, respondent received the sum of $180,000 from Lay in the form of two checks, one in the sum of $100,000 and the other in the sum of $80,000. The former was in settlement of the claim arising from the sale of the 5,000 shares of stock of Oakridge Cemetery Corporation, and the latter in settlement of claims concerning other stocks and notes not here material. Respondent, at the time of the making of said settlement, signed and acknowledged an instrument which recited that in consideration of the sum of $180,000 paid to him by Lay, he sold and transferred to Lay various certificates of stock and promissory notes, including the stock here involved, and on behalf of himself, his heirs, administrators and assigns, released and discharged Lay from all actions, causes of action, suits, claims and demands which respondent or his assigns might have against Lay. Lay had no knowledge concerning the formation of the G. W. G. Corporation or any agreement or transactions between the respondent and such corporation. The $100,000 check received by respondent from Lay was endorsed by respondent, and on January 12, 1933, deposited in the bank to the credit of the G. W. G. Corporation.

January 18, 1933, the directors of the trust approved a report made by respondent as its treasurer, showing the sale of stock to Lay for $100,000. The minutes of that meeting stated that the sale had been made pursuant to authority vested in respondent by the Board and approved the payment of $14,566.08, representing expenses incurred in connection with the sale. In accordance with the terms of the agreement between respondent and the G. W. G. Corporation, respondent received in March, 1933, $1,000 and $1,125, and in December, 1933, received from the Corporation $1,243.13 on account of interest on the unpaid portion of the purchase price. The G. W. G. Corporation was licensed to do business in Illinois on February 11, 1933, and invested in various stocks other than those here involved.

Respondent, in his income tax return for the year 1933, reported no income on account of the transaction with Lay, but included in his report installment payments and interest which he received from the G. W. G. Corporation.

The position of the Commissioner as disclosed in his deficiency letter to respondent is:

"The alleged assignment of this stock" (5000 shares of the stock of Oakridge Cemetery Corporation) "to G. W. G. Corporation * * *" "has been ignored and the transaction" (a succeeding sale to Robert D. Lay) "treated as a sale by you for your own account."

It is the theory of respondent, sustained by the Board (six members dissenting), that by reason of the agreement between respondent and the G. W. G. Corporation, all the claim and interest of the former was transferred to the latter, and inasmuch as they are separate entities for the purposes of taxation, the profit realized from the transaction with Lay was that of the corporation, and, hence, respondent is not chargeable therewith. Notwithstanding the argument by respondent, not disputed by

125.00) on the fifteenth day of January of each year thereafter, until said entire sum of Eighty-five Thousand Dollars ($85,000.00) is paid.

"Said G. W. G. Corporation further agrees to pay interest on said deferred installments at the rate of Three Per Cent (3%) per annum from the date hereof, payable semiannually on the fifteenth day of January and the fifteenth day of

July in each year on the full amount of the unpaid deferred installments.

"In Witness Whereof, the parties have executed this memorandum the day and year first above written.

"(Sgd) G. W. Griffiths          (Seal)
"G. W. G. Corporation,
                    "By Stephen J. Allie,
                         "Its President."

the petitioner, that the sale of the stock to the corporation was free from fraud; that the transaction was in no way concealed and therefore not illegal, we are presented with a situation in which the taxpayer and his counsel intentionally formulated a contrivance for the sole purpose of enabling the taxpayer to avoid the payment of tax. Authorities are called to our attention where such a purpose has been given judicial sanction. One of the leading cases is that of Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596, 97 A.L.R. 1355. There the court, while considering another section of the Revenue Act, used language which we regard as pertinent. The court recognized the rule here contended for by respondent which it stated on page 469, 55 S.Ct. on page 267:

"The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted."

After making this pronouncement, however, the court went on to say:

"Putting aside, then, the question of motive in respect of taxation altogether, and fixing the character of the proceeding by what actually occurred, what do we find? Simply an operation having no business or corporate purpose—a mere device which put on the form of a corporate reorganization as a disguise for concealing its real character, and the sole object and accomplishment of which was the consummation of a preconceived plan, not to reorganize a business or any part of a business, but to transfer a parcel of corporate shares to the petitioner. No doubt, a new and valid corporation was created. But that corporation was nothing more than a contrivance to the end last described. It was brought into existence for no other purpose; it performed, as it was intended from the beginning it should perform, no other function."

Thus, the court, while recognizing the transaction as within the law, yet in very forcible language, denied the claim advanced by the taxpayer.

It would be difficult to find language more aptly describing the present situation. Here, as there, the sole object was the consummation of a preconceived plan not to organize a corporation for a business purpose, but merely as a step in the contrivance to escape taxation. It performed, as was intended from the beginning, no other function, with the possible exception of the subsequent transaction of some business not inconsistent with the scheme of which it was a part. If speed in perfecting a plan to evade taxation be a commendable attribute, the taxpayer and his counsel would be entitled to great praise. Within 24 hours after respondent had information that his claim against Lay was to be settled for $100,000, the corporation was organized in Delaware, a meeting of the directors held in Chicago, an agreement made between the corporation and respondent by which the money to be received in conformity with the settlement was to be paid to the corporation, and before the setting of the sun on the following day, the money had actually been received by respondent and deposited in the bank to the credit of the corporation, all for the purpose of enabling respondent to escape payment of tax upon the profit thus derived and which otherwise would have belonged to the Government.

It is argued by the respondent that by reason of the agreement between him and the corporation, he was acting merely as agent of the latter in making the settlement with Lay and in receiving the money by reason of the same. This was merely another link in the scheme, the form of which must give way to substance. Rather than designating respondent as the agent of the corporation, it is more apt to designate the corporation as the agent of respondent. It was he who was responsible for its organization, who owned all of its stock and whose directors were office associates of his counsel. He was the guiding and controlling genius, rather than the corporation. Regardless of whether the assignment of the stock to the corporation by respondent be construed as contended for by petitioner, or to the contrary, we think he retained effective control and dominion over the same. Under the circumstances, he, no doubt, could have terminated the plan almost as rapidly as he created it. The transaction was for his benefit and not the corporation. We think there is merit to the contention that the income was actually received by the taxpayer in his individual capacity, but if not, it was merely diverted into his corporate pocket, of which he was sole proprietor, and syphoned on the installment basis into his individual pocket. The substance

114

of the transaction rather than the form is controlling.[2]

In Corliss v. Bowers, 281 U.S. 376, 50 S.Ct. 336, 74 L.Ed. 916, the taxpayer created a trust, the income from which was to be paid to his wife for life, the remainder over to their children. By the instrument creating the trust, he reserved power "to modify or alter in any manner, or revoke in whole or in part," the trust agreement. He thereby sought to escape tax liability. The holding was against the position of the taxpayer, and the court on page 378, 50 S.Ct. on page 337, said: "The income that is subject to a man's unfettered command and that he is free to enjoy at his own option may be taxed to him as his income, whether he sees fit to enjoy it or not."

In Lucas v. Earl, 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731, the court, in discussing a situation wherein the taxpayer had sought to escape liability, on page 114, 50 S.Ct. on page 241, said: "But this case is not to be decided by attenuated subtleties. It turns on the import and reasonable construction of the taxing act. There is no doubt that the statute could tax salaries to those who earned them and provide that the tax could not be escaped by anticipatory arrangements and contracts however skilfully devised to prevent the salary when paid from vesting even for a second in the man who earned it. That seems to us the import of the statute before us and we think that no distinction can be taken according to the motives leading to the arrangement by which the fruits are attributed to a different tree from that on which they grew."

In the recent case of Groves v. Commissioner, 4 Cir., 99 F.2d 179, the court in considering a question wherein a scheme was devised to evade taxes, on page 183 said: "The fact that petitioner organized the two corporations, owned and controlled entirely by him, in anticipation of diverting to them the income he knew he would earn, instead of receiving these earnings himself, cannot avail him to escape a proper tax. A taxpayer cannot enter into a contract under which he assigns to another income to be earned and thereby shift the tax on that income from himself. Here the assignment was made to a corporation the petitioner himself controlled."

The court in Chisholm v. Commissioner, 2 Cir., 79 F.2d 14, 101 A.L.R. 200, relied upon by the Board and stressed by respondent, held that the mere purpose to avoid tax by a transfer of property by individuals to a partnership, does not, in itself, vitiate the transaction for tax purposes. The court, however, found that the purpose was to form an enduring partnership to invest and reinvest on a rather extensive scale. It was held that the decision turned on the question whether there was a genuine partnership, or a mere mask for an individual transaction, and concluded it was the former.

In the instant case, it is our view that what was done, including the corporate organization, was a mere mask to cover the real transaction. We therefore conclude the Commissioner correctly treated the transactions as made on respondent's own account. The decision of the Board of Tax Appeals is reversed with directions to determine the deficiency in conformity with such conclusion.

[2] United States v. Phellis, 257 U.S. 156, 42 S.Ct. 63, 66 L.Ed. 180; Lea v. Commissioner of Internal Revenue, 2 Cir., 96 F.2d 55; Helvering v. Gordon, 8 Cir., 87 F.2d 663.