*Decision will be entered under Rule 155.*

BLAINE S. FOX AND NANCY A. FOX, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

BLAINE S. FOX, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 1812–71, 1813–71. Filed March 7, 1974.

*John J. Mitchell, William J. Koehn,* and *Donald J. Brown,* for the petitioners.

*Robert J. Murray* and *Charles Lomax,* for the respondent.

FEATHERSTON, *Judge:* Respondent determined a deficiency in the income tax of petitioners Blaine S. and Nancy A. Fox for 1966 in the amount of $6,372.53 and an addition to tax under section 6653(b)[1] in the amount of $3,186.27. At the trial, respondent conceded that Nancy A. Fox is not liable for the addition to tax but did not make a similar concession as to Blaine S. Fox. Respondent also determined a deficiency in the income tax of Blaine S. Fox for 1967 in the amount of $42,248.88 and an addition to tax under section 6653(b) in the amount of $21,124.44.

The issues for decision are as follows:

(1) Whether the judgment convicting petitioner Blaine S. Fox on charges of embezzling $10,000 during 1966 collaterally estops respondent from determining that Blaine S. Fox realized additional embezzlement income in that year;

(2) Whether petitioner Blaine S. Fox realized taxable income of $30,500, or any lesser amount, as a result of embezzlements from the Bank of Springfield in 1966;

(3) Whether petitioner Blaine S. Fox's taxable income for 1966 and 1967 from his embezzlements should be adjusted for any reim-

---

[1] All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted.

bursements other than the $124,250 which he returned to the Bank of Springfield in 1967;

(4) Whether petitioner Blaine S. Fox is entitled to an ordinary or capital loss on the surrender of the Bank of Otterville stock to the Otterville Investment Corp.;

(5) Whether petitioner Nancy A. Fox is relieved of liability for the joint deficiency for 1966 as an "innocent spouse" under section 6013(e); and

(6) Whether any part of petitioner Blaine S. Fox's underpayment of tax for years 1966 and 1967 was due to fraud within the meaning of section 6653(b).

## FINDINGS OF FACT

Petitioners Blaine S. and Nancy A. Fox were legal residents of Humboldt, Iowa, at the time they filed their petitions. They filed a joint Federal income tax return for 1966 with the district director of internal revenue at Des Moines, Iowa. Petitioner Blaine S. Fox (hereinafter sometimes referred to as Fox) filed a separate Federal income tax return for 1967 with the same office.

During the last 5 months of 1966 and the first 4 months of 1967, Fox was employed as executive vice president of the Bank of Springfield, Springfield, Ill. In this capacity he was in charge of the day-to-day operations of the bank and was authorized to execute cashier's checks and bank drafts. Between August 31, 1966, and April 22, 1967, Fox withdrew and converted to his own use funds totaling $124,250 belonging to the Bank of Springfield, including moneys derived from the following cashier's checks and a draft on another bank:

| Date | Amount | Payee | Type of instrument |
| --- | --- | --- | --- |
| 8/30/66 | $5,000 | Blaine S. Fox | Cashier's check. |
| 9/15/66 | 5,000 | ____do____ | Do. |
| 10/3/66 | 3,000 | ____do____ | Do. |
| 12/12/66 | 1,000 | ____do____ | Do. |
| 12/24/66 | 1,000 | Tom and Cindy Grove | Do. |
| 12/31/66 | 4,000 | Robert Plair | Do. |
| 3/16/67 | 25,000 | Roy M. Turner | Do. |
| 3/31/67 | 1,100 | Monte E. Shake | Do. |
| 3/31/67 | 2,500 | Eric M. Swanson | Do. |
| 3/31/67 | 1,400 | Eugene Hager | Do. |
| 4/10/67 | 58,250 | Otterville Investment Corp | Bank draft. |

The proceeds of the bank draft dated April 10, 1967, in the amount of $58,250 were used by Fox as a downpayment on a contract to purchase 127½ shares of stock of the Bank of Otterville (hereinafter sometimes referred to as "the bank stock") in Otterville, Mo., from the Otterville Investment Corp. for a total price of $118,250. The $60,000 balance owing under the contract was covered by a promissory note executed by petitioners and secured by a pledge of 112½ shares of the

bank stock. Ten shares of the Bank of Otterville stock were unencumbered by the pledge so that petitioners could qualify as directors of that bank. The other 5 shares of the 127½-share total were issued to Robert Dorsey, the president of the Otterville Investment Corp., with the understanding that petitioners would receive them after satisfying the promissory note.

During April of 1967, Fox became president and a member of the board of directors of the Bank of Otterville, and he continued to serve as an officer of the Bank of Springfield.

During his tenure as president of the Bank of Otterville, Fox was in charge of the day-to-day operations of the bank. Between April 10 and April 19, 1967, Fox caused a series of 11 bank drafts of the Bank of Otterville to be drawn on some of its correspondent bank accounts in the total sum of $124,250 as follows:

| Date | Amount | Payee | Type of instrument |
|---|---|---|---|
| 4/10/67 | $500 | Blaine S. Fox | Draft on American Nat. Bank, Chicago |
| 4/10/67 | 500 | ____do____ | Draft on National Stockyards Nat. Bank |
| 4/10/67 | 250 | ____do____ | Draft on Missouri State Bank, Sedalia, Mo. |
| 4/10/67 | 1 | ____do____ | Draft on Security State Bank, Brookfield, Mo. |
| 4/10/67 | 5,000 | ____do____ | Draft on Citizens Nat. Bank, Chillicothe, Mo. |
| 4/10/67 | 59,999 | Bank of Springfield | Draft on National Bank of Commerce, Dallas |
| 4/15/67 | 30,000 | ____do____ | Draft on First Nat. Bank, Kansas City, Mo. |
| 4/19/67 | 4,000 | ____do____ | Draft on First Nat. Bank, St. Louis, Mo. |
| 4/19/67 | 4,000 | ____do____ | Draft on Kemper State Bank, Booneville, Mo. |
| 4/19/67 | 10,000 | ____do____ | Draft on Commerce Trust Co., Kansas City, Mo. |
| 4/19/67 | 10,000 | ____do____ | Draft on Texas Bank and Trust Co., Dallas |
| Total | 124,250 | | |

Fox caused the proceeds of these bank drafts to be transferred to the Bank of Springfield as repayment of the funds which he had previously misappropriated from that bank.

Fox's misappropriations of funds from the Bank of Springfield and the Bank of Otterville were initially discovered by bank examiners in late April of 1967. On or about July 31, 1967, Fox was indicated in the United States District Court for the Southern District of Illinois, criminal docket No. 6693, on five counts of embezzlement and five counts of issuing bills of exchange with intent to defraud the Bank of Springfield during 1966 and 1967 in violation of sections 656 and 1005 of title 18 of the United States Code. The indictment referred to the $5,000 cashier's check dated August 30, 1966; the $5,000 cashier's check dated September 15, 1966; and the $25,000 cashier's check dated March 16, 1967; the cashier's check for $1,100 dated March 31, 1967; and the bank draft for $58,250 dated April 10, 1967, all described in the first of the foregoing tables. Subsequently, this indictment was transferred to the Western District of Missouri and consolidated with criminal docket No. 22525, where Fox entered a plea of guilty to all 10 counts on November 3, 1967. He was sentenced to prison for 3 years

on count 1 and for 3 years on each of counts 2 through 10, inclusive, the sentences to run concurrently.

During 1967, Fox was also charged by information in the United States District Court for the Western District of Missouri, criminal docket No. 22490, with 11 counts of misapplying funds and 11 counts of issuing bills of exchange with intent to defraud the Bank of Otterville in violation of sections 2, 656, and 1005 of title 18 of the United States Code. The items referred to in this information are described in the latter of the two tables set forth above. Fox entered a plea of guilty to all 22 counts of the indictment. He was sentenced to prison for 1 year on count 1, 3 years on count 2, and 3 years on each of counts 3 through 22, inclusive, the sentences to run concurrently.

On May 2, 1967, the Bank of Otterville made a claim against the Western Casualty & Surety Co. (hereinafter Western) on its Bankers Blanket Bond No. 295366 for the loss of $124,250 sustained by reason of Fox's transfer of the funds to the Bank of Springfield. After making payment of the loss under the bond, Western brought suit in November 1967 against the Bank of Springfield for damages in the amount of $124,250, alleging that, as a result of the payment of the loss claim, it was subrogated to the rights of the Bank of Otterville. The Bank of Springfield, on February 24, 1969, filed a third-party complaint in that proceeding against the Otterville Investment Corp. and Fox, joining them as third-party defendants. The third-party complaint alleged that on or about April 10, 1967, Fox had wrongfully caused a bank draft of $58,250 to be drawn against the Bank of Springfield's account and paid to Otterville Investment Corp. as part of the consideration for shares of the Bank of Otterville. It further alleged that if the Bank of Springfield was liable to Western on its claim, then Otterville Investment Corp. was liable to the Bank of Springfield for the $58,250. The third-party complaint further alleged that if the Bank of Springfield was liable to Western, Fox was liable to the bank for the $124,250 misappropriated from it.

After the misappropriations were discovered in April of 1967, petitioners surrendered their 112½ pledged and 10 unpledged shares of the Bank of Otterville stock to the Otterville Investment Corp. The transfer of the stock was made at the direction of Western, and the execution of the stock transfers was witnessed by the bank examiners. Otterville Investment Corp. did not foreclose on the stock; it retained petitioners' uncanceled $60,000 promissory note, and paid petitioners nothing on the surrender of the bank stock.

On December 8, 1969, the Bank of Springfield and Western executed a Covenant Not To Sue And Agreement in which Western assigned to the Bank of Springfield all claims, demands, and causes

of action which it had as subrogee and assignee of the Bank of Otterville against Fox and others arising out of Fox's misappropriations from the Bank of Otterville in the amount of $124,250, referring specifically to the instruments described in the latter of the two foregoing tables. The Bank of Springfield paid Western $65,000 and agreed that Western also would receive the first $30,000 of any sum which the Bank of Springfield recovered from Otterville Investment Corp.

On January 26, 1971, the Bank of Springfield recovered a judgment of $58,250 against Otterville Investment Corp. on grounds of unjust enrichment. On May 2, 1973, the Bank of Springfield obtained a judgment against Fox in the amount of $66,000 (the balance of the $124,250 originally claimed) plus interest as provided by law. At the time of the trial, Fox had not repaid out of his own funds any portion of the funds he misappropriated.

Prior to beginning his employment with the Bank of Springfield in 1966, Fox had worked about 10 years as a banker. In his work he was asked questions about Federal taxation from time to time by bank customers. He prepared the joint return of petitioners for 1966 which was filed on or about January 23, 1967. Fox's separate return for 1967 was prepared by A. W. Hafner, Bookkeeping and Tax Service, with information that Fox had furnished while he was incarcerated. Attached to the 1967 return, which was filed on June 18, 1968, is the following statement that was prepared by Fox:

BLAINE FOX
*3 Rainbow Drive*
*Humboldt, Iowa*

Schedule to 1040

STATEMENT OF EMBEZZLED FUNDS

| | |
|---|---:|
| Amount of alleged mis-appropreation [sic] according to indictment | $218, 600. 00 |
| Actual amount of loss suffered by bonding company to cover shortage | $124, 250 .00 |
| Amount received by Bank of Springfield, Illinois on mis-appropreation [sic] of Funds | $ 66, 100. 00 |
| Amount received by Otterville Investment Corporation, Otterville, Missouri | $ 58, 250. 00 |
| Amount received by Blaine S. Fox and regarded as personal income | 0 |
| Amount of loss | $124, 250. 00 |
| Less Bank of Springfield | —66, 100. 00 |
| Sub-total | $ 58, 250. 00 |
| Less Otterville Investment | —58, 250. 00 |
| Amount received by Blaine S. Fox | 0 |

Fox did not ask Hafner whether the funds which he misappropriated were taxable income. Nor did he consult Hafner regarding the preparation of the statement or the claiming of any deductions on his return.

On April 25, 1967, Fox was interviewed by agents of the Federal Bureau of Investigation (FBI) in connection with a reported robbery of the Bank of Springfield. Pursuant to his request, the agents met with him again on April 26, 1967. At this latter meeting, Fox asked about the relationship between the FBI and the Internal Revenue Service and was told they were in separate departments. Fox then told the FBI agents that he had a substantial amount of income from several sources which could not be traced by the Internal Revenue Service. One source of this income, he stated, was a nursing home in Iowa. The FBI agents then informed Fox of his constitutional right to remain silent. Fox declined to give any further information, stating that he did not want to risk being convicted of income tax evasion in order to clear himself of robbery of the Bank of Springfield.

## OPINION

In the notices of deficiency, respondent determined that Fox realized income from embezzlements in the amounts of $30,500 in 1966 and $93,750 in 1967. The $93,750 embezzled in 1967 is a net figure. Respondent maintains that Fox embezzled $93,750 from the Bank of Springfield and $124,250 from the Bank of Otterville in 1967, but concedes that the $124,250 used to repay the Bank of Springfield is deductible under section 165(c)(2).[2] Respondent also alleges that Fox's deficiencies for both years were, at least in part, due to fraud with the result that Fox is liable for section 6653(b) additions to the tax.

As to the amounts of the deficiencies, petitioners make five arguments: (1) That the judgment of conviction of November 3, 1967, collaterally estops respondent from contending that Fox embezzled more than $10,000 from the Bank of Springfield in 1966; (2) that other sums were not embezzled in that year; (3) that the losses of both banks have been reimbursed and, consequently, petitioner is not taxable on any of the embezzlements; (4) that the surrender of the bank stock to the Otterville Investment Corp. resulted in an ordinary

---

[2] SEC. 165. LOSSES.

    (c) LIMITATION ON LOSSES OF INDIVIDUALS.—In the case of an individual, the deduction under subsection (a) shall be limited to—

    \*        \*        \*        \*        \*

    (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business ; \* \* \*

See Rev. Rul. 65-254, 1965-2 C.B. 50.

loss; and (5) that petitioner Nancy A. Fox is relieved by section 6013(e) of any liability for tax on the embezzled funds. Finally, Fox denies that any part of the deficiencies for either year was due to fraud.

Petitioners have the burden of proving that respondent's determinations of the amounts of the deficiencies are erroneous. *Welch* v. *Helvering*, 290 U.S. 111 (1933); Rule 142, United States Tax Court Rules of Practice and Procedure. However, respondent has the burden of establishing his allegations of fraud. Sec. 7454(a). We must weigh the evidence accordingly.

## 1. *Collateral Estoppel* (*1966*)

Fox is correct in his assertion that he was indicted and convicted in criminal docket No. 22525 of taking only $10,000 in 1966. However, respondent is not estopped by the judgment of conviction in that proceeding from determining that Fox embezzled additional amounts in that year. That judgment of conviction did not purport to deal with any embezzlements not pleaded in the indictment.

The general principle of collateral estoppel or estoppel by judgment is that a fact decided in an earlier suit is conclusively established between the parties and their privies in a later suit, provided that such fact was necessary to the judgment of the first suit. *Hyman* v. *Regenstein*, 258 F.2d 502, 509–511 (C.A. 5, 1958), certiorari denied 359 U.S. 913 (1959). Once the issue is actually determined, it cannot be relitigated between the parties, even in a suit on a different cause of action. *United States* v. *Burch*, 294 F.2d 1, 5 and fn. 4 (C.A. 5, 1961); *John W. Amos*, 43 T.C. 50 (1964), affd. 360 F.2d 358 (C.A. 4, 1965). But the principle applies only to facts essential to the judgment, as opposed to mere evidentiary facts. *Commissioner* v. *Sunnen*, 333 U.S. 591 (1948); *John W. Amos*, 43 T.C. at 54.

The only facts essential to petitioner's conviction in criminal docket No. 22525 on the counts involving misappropriations in 1966 were the facts relating to the taking of the two sums of $5,000 each. Whether other sums were misappropriated was not a fact essential to the court's judgment. Therefore, collateral estoppel or estoppel by judgment does not foreclose respondent's determination that other sums were embezzled in 1966.

## 2. *The Amount of the 1966 Embezzlement*

Fox's contention as to the total amount of the embezzlements, apart from the estoppel-by-judgment argument, discussed above, is that the record does not show any 1966 embezzlements other than the two $5,000 items for which he was indicted and convicted. Fox concedes that

$124,250 was embezzled from the Bank of Springfield but maintains that only $10,000 was taken in 1966 and the remainder in 1967.

The argument that respondent has not shown that Fox's embezzlement income in 1966 exceeded $10,000 misconceives the burden of proof. As stated above, respondent determined that Fox embezzled $30,500 in 1966, and Fox has the burden of proving that respondent's determination is erroneous. He has offered no evidence, other than the judgment of conviction in criminal docket No. 22525, to show that only $10,000 was embezzled in 1966. That judgment has no probative value in deciding whether Fox embezzled other sums in 1966. In the absence of evidence to the contrary,[3] we must sustain respondent's determination that the 1966 embezzlements amounted to $30,500.

3. *The "Repayments" of the Embezzlements (1966 and 1967)*

Petitioner's argument, based on *Wilbur Buff*, 58 T.C. 224 (1972), on appeal (C.A. 2, Dec. 11, 1972), is summarized in his reply brief in these words:

> The basic case can be stated as follows: "A" was an officer at the Bank of Springfield, Illinois in 1966 and 1967. "A" embezzled $124,250.00. (Of this amount, only $10,000.00 was embezzled in 1966. The rest in 1967.) "A" used the money to buy the controlling stock in the Bank of Otterville, Missouri. Then "A" paid the money back to the Bank of Springfield by writing drafts on the Otterville Bank in the amount of $124,250.00. Then the bank examiner at the Otterville Bank required "A"'s bonding company to pay the Bank of Otterville $124,250.00 and Otterville was paid up. The total of funds embezzled in 1967 amounted to $124,250.00. This amount was embezzled at Springfield and paid back. The same amount was embezzled at Otterville and paid back. "A" embezzled $124,250.00 on two occasions. The money was paid back both times. This money was never income to "A". All of the facts are stipulated. All the facts are established by Court judgments.

The argument lacks merit. In *Wilbur Buff*, *supra*, the taxpayer embezzled moneys from his employer, and *in the same taxable year* the taxpayer and his employer agreed that the amount taken would be treated as a judgment debt due from the taxpayer. Holding that the taxpayer did not realize taxable income in the year of the embezzlement, this Court said (58 T.C. at 232):

---

[3] Respondent offered the testimony and report of a certified public accountant who traced the various transactions whereby the Bank of Springfield's funds were embezzled. The report shows embezzlements of $30,500 in 1966. It was admitted over the vigorous objection of Fox's counsel on grounds of the hearsay and best-evidence rules. While, in our opinion, the report is admissible (see McCormick, Evidence, secs. 237–238 (2d ed. 1972); and 4 Wigmore, Evidence, sec. 1230 (Chadbourn rev. 1972)), it is not essential to our conclusion that respondent's determination as to the amount of the 1966 embezzlement must be sustained.

In the instant case, * * * the embezzlement of funds by the petitioner, his recognition of the obligation to repay the embezzled funds, and the making of arrangements for the repayment of those funds, all took place within the same taxable year. Furthermore, in the instant case, there was a consensual recognition of an obligation to repay the embezzled funds in that the petitioner, at the request of his employer, confessed judgment for the amount due.

* * * Where there is "consensual recognition" of indebtedness within the same taxable year, formalized by a confession of judgment, such a transaction does not result in the realization of taxable gain.

Thus, the crucial fact in the *Buff* decision is the consensual recognition of a debt *in the same taxable year* as the embezzlement. The significance of that fact lies in the general rule that each taxable period is to be treated as separate and independent, and items of income and deductions for one year may not be offset and adjusted in computing the tax for another year. *Burnet* v. *Sanford & Brooks Co.*, 282 U.S. 359 (1931). The agreement by the employer in *Buff* to recognize and accept the confession of judgment before the end of the tax year in which the embezzlement occurred was found to prevent the realization of taxable income in that year.

In the instant case, Fox in 1966 neither repaid nor agreed to repay any of the money he embezzled from the Bank of Springfield in that year. The repayment of those embezzlements entitled him to a deduction in 1967, but did not extinguish the income he realized in 1966. The *Buff* case provides no support for petitioner.

As to 1967, respondent allowed petitioner a deduction under section 165(c)(2) for the repayments to the Bank of Springfield of $124,250, leaving net embezzlements in that year in the amount of $93,750. Petitioner argues, however, that he had no net embezzlement income in 1967 because of the reimbursement by Western of the Bank of Otterville's loss pursuant to the indemnity bond. This argument is also without merit.

The legal ground for treating misappropriated funds as income to the embezzler was explained in *James* v. *United States*, 366 U.S. 213, 219–220 (1961), as follows:

When a taxpayer acquires earnings, lawfully or unlawfully, without the consensual recognition, express or implied, of an obligation to repay and without restriction as to their disposition, "he has received income which he is required to return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent." *North American Oil* v. *Burnet, supra* [286 U.S. 417 (1932)], at p. 424. In such case, the taxpayer has "actual command over the property taxed—the actual benefit for which the tax is paid," *Corliss* v. *Bowers, supra* [281 U.S. 376 (1930)]. This standard brings wrongful appropriations within the broad sweep

of "gross income"; it excludes loans. When a law-abiding taxpayer mistakenly receives income in one year, which receipt is assailed and found to be invalid in a subsequent year, the taxpayer must nonetheless report the amount as "gross income" in the year received. *United States* v. *Lewis, supra* [340 U.S. 590 (1951)]; *Healy* v. *Commissioner, supra* [345 U.S. 278 (1953)]. We do not believe that Congress intended to treat a law-breaking taxpayer differently.

Thus, the decisive consideration is the receipt of the misappropriations by the embezzler in the tax year, not the loss by the embezzler's victim. The mere fact that Western, the bonding company, reimbursed the Bank of Otterville did not relieve Fox of the receipt of taxable income in 1967.

### 4. *The Loss Sustained on the "Surrender" of the Bank Stock (1967)*

Petitioner is entitled to a loss deduction on the surrender of the Bank of Otterville stock. In the notice of deficiency for 1967, respondent determined that petitioner "sustained a capital loss of $58,250.00 in a stock purchase contract of common stock of the Bank of Otterville" and that under the capital loss limitation provisions in section 1211 (b),[4] petitioner is limited to a maximum loss deduction of $1,000. The capital loss limitation of section 1211(b) is applicable to the instant case only if petitioner's losses arose from the sale or exchange of a capital asset. Sec. 165(f). Since there is no apparent disagreement between the parties over whether the bank stock was a capital asset in petitioner's hands, the controversy centers on whether the surrender of the stock to the Otterville Investment Corp. was a sale or exchange.

Respondent argues that it is well settled that the sale or exchange of a capital asset need not be a voluntary transaction to come within the capital loss limitation provisions of the Code, citing *Helvering* v. *Hammel*, 311 U.S. 504 (1941). In *Hammel*, the Supreme Court held that a sale following a foreclosure on a secured interest in land, i.e., a forced sale, should be treated no differently than a voluntary sale of the same asset for purposes of the capital gain and loss provisions of

---

[4] SEC. 1211. LIMITATION ON CAPITAL LOSSES.

(b) OTHER TAXPAYERS.—

(1) IN GENERAL.—In the case of a taxpayer other than a corporation, losses from sales or exchanges of capital assets shall be allowed only to the extent of the gains from such sales or exchanges, plus (if such losses exceed such gains) whichever of the following is smallest:

(A) the taxable income for the taxable year,

(B) $1,000, or

(C) the sum of—

(i) the excess of the net short-term capital loss over the net long-term capital gain, and

(ii) one-half of the excess of the net long-term capital loss over the net short-term capital gain.

the Code. The Court stated that the "definitive event" establishing the taxpayer's loss was the foreclosure sale and not the decree of foreclosure which ordered the sale and preceded it. 311 U.S. at 512.[5] Inasmuch as there was neither a decree of foreclosure nor a foreclosure sale in petitioner's case, we think the *Hammel* rule and other cases cited by respondent are clearly inapplicable or distinguishable on their facts.

Here, there was no sale or exchange in substance or in form. When his embezzlements were discovered, we think Fox sought to settle all accounts and, at Western's direction,[6] cooperated by transferring the bank stock to the Otterville Investment Corp. The record shows that petitioners' promissory note was not canceled, and no consideration was paid to petitioners as a result of the stock surrender. Nothing was exchanged by the Otterville Investment Corp. Indeed, in the suit brought by the Bank of Springfield, Otterville Investment Corp., which had obtained both the stock and the $58,250, was held to have been unjustly enriched. Although the facts pertaining to the transaction are sketchy, on this issue we think petitioner should be treated no differently than a mortgagor who voluntarily conveys or abandons the secured property to the mortgagee. Under such circumstances, no sale or exchange ordinarily occurs.[7] Accordingly, we hold that under section 165 (c) (2) petitioner is entitled to a deduction of $58,250 for the loss sustained on the stock surrender and that his net embezzlement income in 1967 is $35,500.

---

[5] Compare Rev. Rul. 73–36, 1973–1 C.B. 372.

[6] As an alternative ground for allowing petitioner the $58,250 deduction in 1967, we think that the surrender of the pledged bank stock constituted a repayment or restoration of embezzled funds. Although the Otterville Investment Corp. was not one of the embezzlement victims, it was the agent of the bank for the sale of the bank stock. Petitioner transferred the stock to the Otterville Investment Corp. at the direction of Western, the assignee of the Bank of Otterville's claim against petitioner. Most likely, the stock surrender arrangement was intended to satisfy or facilitate the collection of Western's claim. If petitioner had transferred the bank stock directly to Western or the Bank of Otterville, he would have been entitled to a credit for repaying embezzled funds, and we see no reason why the transfer in the present case, which sought to accomplish the same objective, should be treated differently.

[7] Generally, the cases hold that where the mortgagor is not personally liable, no sale or exchange takes place when the secured property is abandoned and no consideration flows from the mortgagee to the mortgagor. See *Commissioner* v. *Crane*, 153 F.2d 504, 506 (C.A. 2, 1945), affirmed on other grounds 331 U.S. 1 (1947); *Stokes* v. *Commissioner*, 124 F.2d 335, 337–339 (C.A. 3, 1941) (mortgagor "surrendered" secured land to mortgagee); *William H. Jamison*, 8 T.C. 173, 175–181 (1947). Here, although the terms of the pledge agreement are not in evidence, there is nothing in the record to indicate that the Otterville Investment Corp. had recourse to assets other than the pledged stock. Furthermore, even if petitioners were personally liable on the note, their liability was not canceled by the Otterville Investment Corp. in consideration for the stock surrendered. Otterville Investment Corp. retained the stock, the $58,250, and Fox's $60,000 note until the Bank of Springfield recovered its judgment.

## 5. Applicability of Section 6013(e) to the Liability of Nancy A. Fox for 1966

Section 6013(e)[8] relieves an "innocent spouse" of liability for tax on sums omitted from a joint return if three basic conditions are met: (1) The omission is in excess of 25 percent of the amount of gross income stated on the return; (2) the spouse in signing the return does not know of, and had no reason to know of, such omission; and (3) taking into account all the facts, including whether or not the spouse significantly benefited from the omitted items of gross income, it would be inequitable to hold her liable. See *Patricia E. Mysse*, 57 T.C. 680, 697 (1972).

Respondent concedes that the first of these three conditions is met. The misappropriations in 1966 clearly exceed 25 percent of the gross income reported on the return for that year. However, Nancy A. Fox was not called as a witness to testify as to whether she knew of the 1966 embezzlements, and there is no testimony or other evidence of record on which we could base a finding that she did not know of them. Nor is there any showing that she did not benefit from the misappropriations or any evidence revealing what was done with any of the embezzlements from the Bank of Springfield except the $58,250 downpayment for the Bank of Otterville stock in 1967. (The record shows that she became a coowner of that stock and a director of the bank.) We are, therefore, compelled to conclude that she has not shown that she is entitled to the benefit of section 6013(e). See *Jerome J. Sonnenborn*, 57 T.C. 373, 381–383 (1971).

---

[8] SEC. 6013. JOINT RETURNS OF INCOME TAX BY HUSBAND AND WIFE.

(e) SPOUSE RELIEVED OF LIABILITY IN CERTAIN CASES.—

(1) IN GENERAL.—Under regulations prescribed by the Secretary or his delegate, if—

(A) a joint return has been made under this section for a taxable year and on such return there was omitted from gross income an amount properly includable therein which is attributable to one spouse and which is in excess of 25 percent of the amount of gross income stated in the return,

(B) the other spouse establishes that in signing the return he or she did not know of, and had no reason to know of, such omission, and

(C) taking into account whether or not the other spouse significantly benefited directly or indirectly from the items omitted from gross income and taking into account all other facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such omission, then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent that such liability is attributable to such omission from gross income.

(2) SPECIAL RULES.—For purposes of paragraph (1)—

(A) the determination of the spouse to whom items of gross income (other than gross income from property) are attributable shall be made without regard to community property laws, and

(B) the amount omitted from gross income shall be determined in the manner provided by section 6501(e)(1)(A).

## 6. *Fraud Penalties*

Section 6653(b) [9] calls for a 50-percent addition to the tax for any year in which any part of the taxpayer's underpayment of tax for that year is due to fraud. As noted, section 7454(a) places upon respondent the burden of proving fraud. To carry this burden, respondent must prove by clear and convincing evidence that the taxpayer knowingly understated his income with the specific purpose of evading a tax believed to be owing. The test is the intent at the time the return is filed, not some earlier or later date. *Harry Gleis*, 24 T.C. 941, 952 (1955), affirmed per curiam 245 F.2d 237 (C.A. 6, 1957). The presence or absence of such intent is to be determined by a close examination of the taxpayer's whole course of conduct in his relationship to the realization of the income item and his failure to include it in his reported income.

The meager evidence on the issue of fraud is not sufficient, in our opinion, to show that Fox's failure to report his embezzlements as income in the 1966 and 1967 returns was fraudulent. The circumstances on which respondent relies are not sufficient to show an intent to conceal taxable income believed to be due and owing.

A. *1966.*—To support his allegations as to fraud for 1966, respondent emphasizes (1) Fox's general knowledge of the tax law, gained while working as a banker; (2) Fox's conversation with agents of the FBI; and (3) the fact that Fox's return for 1966 was filed January 23, 1967, before any wrongdoing had been discovered.

The evidence as to the extent of Fox's knowledge of tax law is limited to a single question and answer which followed testimony that he had worked as a banker for about 10 years:

Q. In the course of your work as a banker, were you frequently asked questions regarding taxation of savings or other bank business?

A. Well, I can't recall anything taxation of savings, any specifics. But, I'm certain I was asked many times about tax things. Yes.

He also testified that when he filed the 1966 return, he "certainly didn't feel there was any income to be reported." In this connection, we note that he repaid the entire amount of the moneys taken from the Bank of Springfield, albeit with other embezzled funds, within 3

---

[9] SEC. 6653. FAILURE TO PAY TAX.

(b) FRAUD.—If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. In the case of income taxes and gift taxes, this amount shall be in lieu of any amount determined under subsection (a). In the case of a joint return under section 6013, this subsection shall not apply with respect to the tax of a spouse unless some part of the underpayment is due to the fraud of such spouse.

months after he filed the 1966 return. While this repayment does not cause the 1966 misappropriations to be nontaxable in that year, it is a factor to be taken into account in weighing the evidence as to whether he actually believed that he owed a tax on those funds.

The conversation with the FBI agents as to his possible unreported income is in no way shown to relate to the 1966 embezzlements. In that conversation, Fox told the FBI agents he had "a sizeable amount of income other than the bank" from "some partnership or something in a nursing home in Iowa" which could not be traced by the Internal Revenue Service. The record contains no information, one way or the other, as to whether or when Fox had income from an Iowa nursing home.

Further, the conversation with the FBI agents occurred on April 26, 1967. Fox had used the $58,250 taken from the Bank of Springfield on April 10, 1967, as a downpayment on the Bank of Otterville stock. During the period between April 10 and April 19, 1967, he had repaid the Bank of Springfield the $124,250 (including all the 1966 misappropriations) which he had embezzled. Thus, assuming arguendo that in his conversation with the FBI agents, petitioner was alluding to his embezzlements, it is more logical to conclude that, at that time, he was referring to the funds embezzled from the Bank of Otterville in 1967. While his conversation with the FBI agents may have revealed a state of mind which would easily succumb to a tax-evasion temptation, we do not think it was so clearly related to the 1966 embezzlements as to carry much weight.[10]

B. *1967.*—The statement attached to the 1967 return, quoted in our Findings, is, we think, inconsistent with a specific intent to evade income taxes on the 1967 embezzlements. See *Lorenzo C. Dilks*, 15 B.T.A. 1294, 1301 (1929), affirmed per curiam 69 F.2d 1002 (C.A. 7, 1934); cf. *George W. Griffiths*, 37 B.T.A. 314, 320–321 (1938), reversed on other grounds 103 F.2d 110 (C.A. 7, 1939), affd. 308 U.S. 355 (1939). The return was filed while Fox was incarcerated for misappropriating funds. He was sufficiently well informed to know the Internal Revenue Service keeps abreast of such developments. The statement refers specifically to embezzled funds and to an indictment— red flags which he must have known were certain to invite an investigation. True, his computation reduced the amounts embezzled by various sums (the $124,250 payment by the bonding company; the $58,250 payment to the Otterville Investment Corp.; and another $66,100 allegedly received by the Bank of Springfield) which left a zero

---

[10] The recent opinion of this Court in *George C. McGee,* 61 T.C. 249 (1973), in which we held that the taxpayer in that case had fraudulently failed to report embezzled funds as income, is distinguishable on its facts.

amount that he "regarded as personal income." But we do not think the statement was so misleading as to support a finding that Fox attempted to evade tax which he believed was due and owing to the Government.

*Decisions will be entered under Rule 155.*