THERESA MANTONE, a/k/a TERRY MANTONE, CAMILLE, ANGIE, MILDRED AND/OR ANGELINA FAENZA, ANGIE GETCHES, CARMELLA SCIACCA, ALSO T/A CONNIE'S REALTY CORPORATION, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Mantone v. Commissioner
Docket Nos. 5810-71, 5811-71, 7571-76.
United States Tax Court
T.C. Memo 1978-244; 1978 Tax Ct. Memo LEXIS 273; 37 T.C.M. (CCH) 1047; T.C.M. (RIA) 78244; June 29, 1978, Filed John J. O'Toole,Bruce E. Goldman,Meyer Weinberg,Edwin F. Fradkin, and Harvey R. Zeller, for the petitioners. William M. Gross, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge *274 : Respondent determined deficiencies in petitioners' income tax for the years and in the amounts as follows: Docket
Fraud Addition Number
Year
Tax
to the Tax
5810-71 Theresa Mantone
(1968
$ 382,477
$ 191,682
(1969
393,625
196,813
5811-71 Vincent Mantone
(1968
382,477
191,682 [2]
1969
393,625
196,813
7571-76 Vincent Mantone
(1967
132,198
66,099
and
Theresa Mantone
(1970
81,162
40,581
*275 All the issues in these cases were disposed of by agreement of the parties except the following: (1) Whether Vincent Mantone is liable for the addition to tax for fraud under section 6653(b), I.R.C. 1954, [3] for the years 1967, 1968, 1969 and 1970; and (2) whether Vincent Mantone qualifies as an innocent spouse under section 6013(e) so as to be relieved from liability for the deficiencies in tax for the years 1967, 1968, 1969 and 1970. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Theresa Mantone and Vincent Mantone are husband and wife whose legal residence at the time the petitions in these cases were filed was in Union, New Jersey. Petitioners filed joint Federal income tax returns for the calendar years 1967, 1968, 1969 and 1970. During the taxable years 1967 through 1970, Theresa Mantone owned and operated an illegal lottery in and around East Orange, New Jersey. The lottery was a conventional 3 digit numbers game with winning numbers based on the paramutal payoffs of 3 predetermined horse races. Theresa Mantone *276 employed writers who took bets either directly or by telephone from individual bettors. These writers would record the numbers and the amounts wagered on the bet slips and then on tally sheets. These records were referred to by the writers as the "work" or "action." At the end of each day the "work" was either phoned into Theresa Mantone by the writers or collected by "pickup" men who delivered it to her or someone designated by her. Theresa Mantone, who was known also as Terry, was the owner or "banker" and the profits or losses of the lottery operation were hers. She employed as her chief assistant Anthony Priccante and at times had the "pickup" men deliver "work" to him. Theresa's writers received a commission on the total amounts written and in addition received a percentage of any "hits" on numbers they wrote. Pickup men were generally paid fixed amounts. When a bettor "hit," the writer received the payoff from either Theresa or Priccante and paid that amount, less an agreed percentage, to the winner. On April 21, 1969, pursuant to a warrant issued by the New Jersey Superior Court, the New Jersey State Police raided an apartment used in Theresa's lottery operation *277 in East Orange, New Jersey. Theresa and Priccante were arrested on the premises at the time of the raid. Theresa had also been arrested in a prior raid on February 4, 1969. Theresa's husband, Vincent Mantone, knew of both of these arrests. During 1967, Robert Rose was the owner and operator of a shoe shine parlor and candy store in Newark, New Jersey. Sometime between April and June 1967, Theresa and Vincent Mantone came into Mr. Rose's candy store. In Vincent's presence, Theresa told Mr. Rose that she was a numbers boss and wanted to hire him to pickup "work" for her from place to place. Mr. Rose accepted employment from Theresa as a "pickup man" and worked in that capacity for Theresa until February 4, 1969. The reason he quit was that he was arrested in a raid on February 4, 1969, but not the same raid in which Theresa was arrested on that day. In fact, Theresa was not with Mr. Rose when he was arrested on February 4, 1969. Mr. Rose decided that he would quit working for Theresa since he did not want to be involved with any further raids or arrests. Mr. Rose would pickup both "work" and cash which he would take to Theresa. Generally, he turned the "work" and cash over *278 to Theresa at the residence of Lucille and Steven Shelton in East Orange, New Jersey. Generally, he would meet Theresa at the Sheltons three times a week. On several of the occasions when Mr. Rose met Theresa at the Sheltons, Vincent would come to the Sheltons with Theresa. After first being employed by Theresa in 1967, it was approximately 2 months before Mr. Rose saw Vincent Mantone again. Thereafter, Mr. Mantone came into Mr. Rose's store and talked to Mr. Rose on a number of occasions. When Mr. Rose first talked with Theresa in 1967, they talked in the back of the store and Vincent Mantone remained in the front part of the store. When Vincent Mantone would come with Theresa to the Sheltons' residence to pick up "work" and cash from Mr. Rose, he would usually go in the kitchen while Mr. Rose transacted his business with Theresa in the living room. Generally, Mrs. Shelton would be in the kitchen with Vincent Mantone and the door between the kitchen and the living room would be open. Mr. Rose's transactions with Theresa would take 4 or 5 minutes. The "work" and the money would each be in a sealed envelope. During the period 1967 through 1970, one of Theresa's numbers *279 writers was Lucille Shelton. She first met Vincent Mantone when Theresa brought him to her home and introduced him to her and told her that he would pick up the "work" sometimes. Thereafter, on occasions Vincent Mantone came to Lucille's home and picked up her "work" or bet slips. When Mr. Mantone came to Mrs. Shelton's home he would sit down in her house until she finished the "work" and then she would fold up the "work" and give it to him. After Mrs. Shelton gave Mr. Mantone the bet slips or "work," he would leave. On several occasions during the time Mrs. Shelton worked for Theresa, Mr. Mantone came and picked up "work" from her. In the fall of 1970, Mrs. Shelton had gotten into debt to Theresa because someone owed her some money which she should have collected and paid over to Theresa. She and Theresa got into a dispute about the debt and Theresa said things to Mrs. Shelton that Mrs. Shelton interpreted as a threat to her and her family if her indebtedness to Theresa was not paid. Mrs. Shelton suffered from high blood pressure and had two heart attacks in October 1970. Because of Mrs. Shelton's physical condition, her husband, who was not involved in the numbers business *280 at all, made arrangements to pay off Mrs. Shelton's indebtedness to Theresa. Mrs. Shelton's husband initially agreed to pay the money to either Theresa or Priccante. Mr. Steven Shelton, the husband of Lucille Shelton, was employed in 1970 by a shoe store in Newark, New Jersey. After his wife became ill in October 1970, he told Theresa to stay away from his home but to come down to the shoe store where he worked and he would pay off his wife's debt to her. Theresa came down to the store several times with Priccante and collected money from Mr. Shelton. One day, Anthony Priccante brought Vincent Mantone with him to the store where Mr. Shelton worked and told Mr. Shelton that Mr. Mantone would be collecting the money he was paying to Theresa on Mrs. Shelton's debt to her. Thereafter, on a number of occasions, Mr. Mantone came in and picked up the weekly payments that Mr. Shelton was making on Mrs. Shelton's indebtedness to Theresa. Sometime after Mrs. Shelton had ceased to work for Theresa, Mr. Mantone came by her home one Sunday afternoon and asked her if any Government man had been to see her inquiring about him and Theresa. Although in fact a special agent of the Internal *281 Revenue Service had talked to Mrs. Shelton, she answered Mr. Mantone's question with "No." Vincent and Theresa Mantone's Federal income tax returns for the calendar years 1967, 1968, 1969 and 1970 were prepared by an accountant, David Amster, who had offices in Newark, New Jersey. In the early months of 1968, 1970 and 1971, Theresa Mantone came to Mr. Amster's office and brought with her a W-2 form showing the wages that Mr. Mantone had received from his employment by Held Warehouse as a forklift operator. During all of the years here involved Mr. Mantone was employed by Held Warehouse as a forklift operator. The compensation he received from this work was $ 7,425 for 1967; $ 8,161 for 1968; $ 8.251 for 1969; and $ 8,887 for 1970. Theresa Mantone would also bring with her statements with respect to such items as medical expenses, contributions, taxes, union dues, and miscellaneous expenses and information with respect to interest and dividend income. After she brought the information with respect to Mr. Mantone's wages and the other items to Mr. Amster, he would inquire of her if she had included all of her interest and dividend income, and she would answer "Yes." Mr. Amster *282 would then, from the information brought in by Theresa, prepare a joint tax return for Vincent and Theresa Mantone from the information so furnished and Theresa Mantone would come and pick up the return he had prepared, after he had signed the return as preparer, and take it with her. The joint return of Vincent and Theresa Mantone for the year 1968 was not timely filed. Sometime shortly prior to the first of November 1969, Theresa brought to Mr. Amster the same type information that she had brought to him shortly after the close of the taxable year for the other taxable years here involved. Mr. Amster prepared Vincent and Theresa Mantone's joint income tax return for 1968 from the information brought to him by Theresa in the fall of 1969. He gave this return to her unsigned and told her that she and Mr. Mantone should sign the return and return it to him for mailing to the Internal Revenue Service. The 1968 return was mailed to the Internal Revenue Service in an envelope showing Mr. Amster's return address. Vincent and Theresa Mantone's 1967 return was signed on February 7, 1968, by Mr. Amster and on February 10, 1968, by each Mr. and Mrs. Mantone. The 1969 return was signed *283 on March 28, 1970, by Mr. Amster and on April 1, 1970, by each Mr. and Mrs. Mantone. The 1970 return was signed on February 26, 1971, by Mr. Amster and on March 9, 1971, by each Mr. and Mrs. Mantone. The untimely filed 1968 return was signed on November 1, 1969, by each Mr. and Mrs. Mantone and on November 3, 1969, by Mr. Amster. The returns of Mr. and Mrs. Mantone reported the following income items for the years 1967 through 1970: Year and Amount Reported Item
1967
1968
1969
1970
Wages
$ 7,425
$ 8,161
$ 8,251
$ 8,887
Interest
110
149
282
110
Long-term Capital Gain
6,489 [4]
The returns for 1967, 1968, 1969 and 1970 also showed dividend income of $ 66, -0-, $ 124, and $ 130, respectively, all of which was shown to be from jointly held stock and, therefore, subject to the allowable exclusion. On the returns for 1967 and 1968 deductions were itemized. The totals of itemized deductions were $ 1,309 and $ 831 for 1967 and 1968, respectively. The standard *284 deduction was claimed on the returns for 1969 and 1970. On their 1967 return the Mantones claimed exemptions for 3 dependent children and on their 1968, 1969 and 1970 returns claimed exemptions for 2 dependent children. In 1970, Mr. Mantone purchased a 1967 Cadillac and in 1971 he purchased a new Buick. The Buick cost around $ 5,000. Although the Buick was puchased in Mr. Mantone's name, Theresa actually bought the car. No income or expenses pertaining to the operation of a lottery were reported on petitioners' joint income tax returns for the calendar years 1967 through 1970. In each of the taxable years 1967 through 1970, there was a 25 percent omission of gross income from petitioners' joint income tax returns which omitted income was attributable to Theresa. Theresa, by stipulation filed at the trial, conceded that she is liable for the deficiencies in income tax and additions to tax for fraud determined against her in the statutory notices of deficiency for each of the taxable years 1967, 1968, 1969 and 1970. Vincent Mantone contends that he is not liable for the addition to tax for fraud under section 6653(b) for any of the years here in issue since no part of *285 the underpayment in tax is due to his fraud. Mr. Mantone further contends that under the provisions of section 6013(e) he is not liable for any of the deficiencies in tax determined against him or against him and his wife jointly for the years here in issue since he has established that in signing the returns he did not know of, and had no reason to know of, the omitted income. OPINION Section 6013(e) provides that where a joint return has been made under section 6013 on which there is omitted income attributable to one spouse which is in excess of 25 percent of the gross income reported, the other spouse shall be relieved of tax on such income if he establishes that he did not know of, and had no reason to know of, such omission and taking into account all facts with respect to the omitted income including whether the other spouse significantly benefited from the omitted items it is inequitable to hold such spouse liable for the deficiency. [5]
*286 In order for an individual to be relieved of tax under section 6013(e)(1), he must establish all of the conditions prescribed in that section. Adams v. Commissioner,60 T.C. 300, 303 (1973). Here the parties have stipulated the 25 percent omission from income and that the omitted income was that of Theresa. Therefore, the two items which Mr. Mantone must establish under the requirements of section 6013(e) are that he did not know, and had no reason to know, of the omissions from income and that it would be inequitable to hold him liable for the deficiencies. See Fox v. Commissioner,61 T.C. 704, 716 (1974). From the recitation of the facts which we have set forth, it is clear to us that Mr. Mantone did know of Mrs. Mantone's numbers business and did know that she derived income from this business.He actually had been with her when she employed a pickup man and had picked up bet slips and cash for her during the years in issue. He even knew prior to the time of the filing of the 1968 and subsequent returns about her arrests on charges of operating a numbers lottery. It is so clear from our recitation of facts that Mr. Mantone has failed to establish *287 that he did not know of Theresa's income from the numbers operation that in our view this issue needs no further discussion. Respondent, of course, has the burden of establishing that Mr. Mantone is liable for the additions to tax for fraud. Since Mr. and Mrs. Mantone filed joint returns, under the provisions of section 6013 they are jointly and severally liable for the taxes which are properly due including the additions to tax for fraud unless these additions to tax are not applicable to Mr. Mantone because no part of the underpayment is due to his fraud. [6] See Davenport v. Commissioner,48 T.C. 921, 926 (1967), which was decided prior to the amendment of section 6653(b) by the addition thereto of the provision: In the case of a joint return under section 6013, this subsection shall not apply with respect to the tax of a spouse unless some part of the underpayment is due to the fraud of such spouse. *288 Respondent has the burden of establishing by clear and convincing evidence that some part of the underpayment in tax for each of the years in issue is due to Mr. Mantone's fraud. However, respondent is not required to establish that any portion of the omitted income was the income of Mr. Mantone. If respondent shows by sufficient evidence that Mr. Mantone participated in the fraudulent omission of his wife's income from the joint returns he filed with his wife, he has shown fraud on the part of Mr. Mantone. On the basis of this record, we conclude that respondent has established by clear and convincing evidence that Mr. Mantone at the time he signed the returns for the years here in issue knew that his wife had income from a lottery operation which was omitted from their reported income and that his signing of the returns, knowing of this omitted income, was fraudulent. The evidence is clear that Mr. Mantone knew of his wife's business because of his assistance to her in that business. He knew that she derived income from the business since he went with her to make collections and made some collections for her. Although Mr. Mantone had picked up bet slips from Mrs. Shelton *289 and money from Mr. Shelton, when asked on the witness stand if he knew Mr. and Mrs. Shelton, Mr. Mantone testified that he did not. He also testified that he did not know Mr. Rose although he had gone to Mr. Rose's store with Theresa when she hired Mr. Rose as a pickup man and had visited Mr. Rose's store on a number of other occasions. We believe the testimony of Mr. and Mrs. Shelton and Mr. Rose concerning their acquaintance with Mr. Mantone. The circumstances of this acquaintance were such that in our view Mr. Mantone could not have been unaware that he knew Mr. and Mrs. Shelton and Mr. Rose when they were pointed out to him in the courtroom and he was asked if he knew them. Mr. Mantone testified that he did not know his wife was in the lottery business, but thought her only occupation was that of a housewife. He testified he thought the approximately $ 5,000 she paid for an automobile registered in his name came from amounts she saved from the household funds which he gave her to pay the household expenses. This testimony is unbelievable in light of the other evidence in this record. Mr. Mantone testified that he signed returns in blank and gave them to his wife to take *290 to Mr. Amster to prepare. This testimony is contradicted by Mr. Amster's testimony that he never filled in a return for anyone that had been signed in blank and because of this consistent practice could state that he did not fill in such a return for Mr. and Mrs. Mantone. It is also contradicted by the fact that except for the year 1968 for which an untimely return was filed, the dates of signing appearing by Mr. Mantone's signatures were subsequent to the dates appearing by Mr. Amster's signatures as preparer of the returns. The return for 1968 was filed late. It was filed subsequent to arrests of Theresa Mantone on February 4, 1969, and April 21, 1969. The record contains no explanation for the late filing of the 1968 return. We conclude that for each year here involved Mr. Mantone knew that his wife had income from the lottery operation and for each such year knew this income was omitted from their joint income tax returns when he signed those returns. On the basis of the record as a whole, we conclude that the evidence is clear and convincing that some part of the underpayment in tax due by Mr. and Mrs. Mantone for each of the years 1967, 1968, 1969 and 1970 is due to *291 the fraud of Mr. Mantone. Decisions will be entered for the respondent. Footnotes
1. Cases of the following petitioners are consolidated herewith: Vincent Mantone, docket No. 5811-71; and Vincent Mantone and Theresa Mantone, docket No. 7571-76.↩
2. Although respondent did not in his notice of deficiency determine that Vincent Mantone was liable for additions to tax for fraud for the years 1968 and 1969, in his answer he affirmatively alleged that Vincent Mantone was liable for the additions to tax for fraud under sec. 6653(b), I.R.C. 1954, for the years 1968 and 1969 in the respective amounts of $ 191,682 and $ 196,813, and made claim for such additions to tax under the provisions of sec. 6214(a), I.R.C. 1954. Both the deficiencies determined by respondent and the claimed additions to tax for fraud were determined against Theresa Mantone and Vincent Mantone on the total income respondent contends was received by the two of them, and therefore these determined deficiencies and additions to tax are duplications for the years 1968 and 1969.↩
3. Statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩
4. The total long-term capital gain was computed as follows: ↩
Proceeds
$ 31,500
Cost of Capital Stock
18,523
Long-term Capital Gain Dividend
$ 12,977
5. SEC. 6013(e). Spouse Relieved of Liability in Certain Cases.-- (1) In General. Under regulations prescribed by the Secretary or his delegate, if-- (A) a joint return has been made under this section for a taxable year and on such return there was omitted from gross income an amount properly includable therein which is attributable to one spouse and which is in excess of 25 percent of the amount of gross income stated in the return, (B) the other spouse establishes that in signing the return he or she did not know of, and had no reason to know of, such omission, and (C) taking into account whether or not the other spouse significantly benefited directly or indirectly from the items omitted from gross income and taking into account all other facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such omission, then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent that such liability is attributable to such omission from gross income. (2) Special Rules.--For purposes of paragraph (1)-- (A) the determination of the spouse to whom items of gross income (other than gross income from property) are attributable shall be made without regard to community property laws, and (B) the amount omitted from gross income shall be determined in the manner provided by section 6501(e)(1)(A).↩
6. SEC. 6653(b)↩. Fraud.--If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. In the case of income taxes and gift taxes, this amount shall be in lieu of any amount determined under subsection (a). In the case of a joint return under section 6013, this subsection shall not apply with respect to the tax of a spouse unless some part of the underpayment is due to the fraud of such spouse.