CHRISTO M. DRAGATSIS AND MARY J. DRAGATSIS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Dragatsis v. Commissioner
Docket Nos. 4393-80, 8427-82.
United States Tax Court
T.C. Memo 1984-122; 1984 Tax Ct. Memo LEXIS 554; 47 T.C.M. (CCH) 1260; T.C.M. (RIA) 84122; March 12, 1984. Joseph M. Solon and Martin Cohn, for the petitioners. Judy Jacobs, for the respondent. HAMBLEN
MEMORANDUM FINDINGS OF FACT AND OPINION HAMBLEN, Judge: In these consolidated cases, respondent determined the following deficiencies in and additions to petitioners' Federal income taxes: Section 6653(a) [1]
Year
Deficiency
Addition
1972
$15,915.36
$795.77
1974
8,486.43
424.32
1977
6,341.00
1978
10,783.26
1979
3,273.92
After concessions, the primary issue for determination is whether petitioner Christo Dragatsis received unreported taxable income during 1972 and 1974 from embezzlement from a partnership in which he was a general partner. In the event this primary issue is determined adversely to petitioners, we must also determine the following issues: (1) Whether an addition to tax for underpayment due to negligence *556 or intentional disregard of rules and regulations is warranted under section 6653(a)(1); (2) whether subsequent repayment of funds to the partnership entitles petitioners to compute their tax liability under the provisions of section 1341 regarding restoration of substantial amounts previously held under claim of right; and (3) whether petitioner Mary Dragatsis is relieved of liability for tax under the innocent spouse provisions of section 6013(e). FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioners Christo M. Dragatsis and Mary J. Dragatsis [2] resided in Joliet, Illinois, when they filed their joint Federal income tax returns for the years in issue and when they filed their petitions in these cases. Petitioner was an insurance broker. Over the years, petitioner became involved in other businesses as well. Petitioner owned the Hoffman Glass Company and the Joliet Donut Company. Furthermore, since 1963, petitioner designed, constructed, and owned various apartment buildings and commercial properties. *557 Petitioner discovered that banks willing to lend funds for the construction of buildings would not provide 100 percent of the funds necessary to complete development. Instead, lenders required borrowers to put approximtely 20 percent of the anticipated cost of construction into the project from their own funds. Petitioner developed a scheme to obtain 100 percent financing. He would overestimate his construction costs in the budget submitted to the lender and request a loan in an amount which would provide 100 percent of the actual budgeted cost of development. Petitioner's subcontractors overstated their invoices to him for goods and services supplied by an amount that corresponded to the overstated budget. As the bank disbursed the loan, petitioner would pay the full invoice amounts to the subcontractors and receive rebates in the amount of the excess payments. The rebates would reimburse petitioner for the amounts he would put into the project initially to satisfy his lenders. In this way, petitioner avoided permanently investing his own cash in his projects and prevented his lenders from learning what he was doing. George Michas and William Michas ("Michases") were clients *558 and good friends of petitioner. In 1971, petitioner learned that the Michases had located a 10 acre parcel of undeveloped land with commercial development prospects in a community near Joliet known as Shorewood. It was agreed among petitioner and the Michases that they would purchase the property and develop a shopping center thereon, to be called the Shorewood Plaza. Petitioner and the Michases bought the property in their three names in September 1971 for $60,000.00. The purchase money was borrowed from the Union National Bank of Joliet. Petitioner and the Michases entered into an oral partnership agreement to acquire and develop the property. The partnership was called D & M Company ("D&M" or the "partnership"). Each partner contributed $100 towards the capital of the partnership. It was agreed that they would be equal one-third partners as to capital contributions, profits, and losses. As neither of the Michases had much knowledge about construction or real estate matters, it was agreed petitioner would do the work necessary to arrange financing, construction, renting, maintenance, and management of the development. Each partner made additional contributions of capital *559 to D&M of approximately $6,000.00 each during the first two months of 1972. Petitioner drew up plans for the first stage of development of the property and estimated the true total cost would be $300,000.00 to $350,000.00. Petitioner then sought a loan for the project and told prospective lenders the project would require $400,000.00 to complete. D&M obtained a construction loan, convertible to a 15 year loan on completion, from the First National Bank of Joliet ("First National") in the amount of $350,000.00. The promissory note given to First National to represent this loan was executed by petitioner, the Michases, and their respective wives. Each signator was fully liable to repay the debt.D&M opened a checking account with First National in order to receive the proceeds of the loan as disbursed and pay the subcontractors. Two signatures were required to write a check against this account. Petitioner acted as the contractor for the Shorewood project and made all necessary arrangements with the subcontractors for the construction of the first phase. All agreements made with the subcontractors were made in the name of petitioner individually, and not in the name of D&M. Petitioner *560 made arrangements with three subcontractors for overbilling and rebating. Petitioner received seven rebate payments totalling $40,000.00 during 1972. All of these payments were deposited in separate bank accounts in the name of petitioner and Mrs. Dragatsis. Petitioner did not consult with the Michases about the overbilling and rebating and the Michases did not know of these transactions for several years. Upon completion of the first phase of development in late 1972, phase two of development of the Shorewood property was commenced. Petitioner obtained a commitment from the Louis Joliet Bank to lend $370,000.00 for the construction of phase two. Petitioner and his partners executed the promissory note to evidence this loan. As D&M did not an account with the Louis Joliet Bank, all disbursements of loan proceeds were deposited in petitioner's own account with that bank. Petitioner then transferred these funds to the D&M account at First National to pay construction costs. Petitioner again acted as contractor and made arrangements with several of the subcontractors for overbilling and rebating. Petitioner received seven separate rebates in 1974 totalling $35,000.00. Three *561 of the payments, totalling $15,000.00, were deposited by petitioner into an account in the name of the Joliet Donut Company. Two payments, totalling $10,000.00, were deposited by petitioner in an account in the name of Hoffman Glass Company. The remaining two rebates, totalling $10,000.00, were cashed. Sometime in the Spring of 1974, respondent audited the 1972 Federal income tax return of one of the subcontractors and noticed a rebate payment made to petitioner. An audit of D&M was begun to determine the nature and origin of the transactions giving rise to the rebates. At this time, petitioner denied that any of these payments were rebates or otherwise connected with any of the subcontractors. Respondent's agent referred the matter to a special agent in July 1974 in order that a criminal investigation could be made. On November 11, 1974, at the first meeting between respondent's special agent and petitioner, petitioner admitted for the first time the disputed funds were rebates but also stated his partners were aware of the rebates. However, the Michases did not then know of the rebates. They first learned of the rebate scheme from respondent's agents on inquiries stemming *562 from the meeting in November of 1974 between respondent's agents and petitioner. Shortly thereafter, petitioner corrected his story with respondent's agents and stated that the Michases did not know of the overbillings. In December 1974, petitioner drew a check on one of his own accounts in the amount of $75,000.00, payable to D&M. However, petitioner endorsed the check in the name of D&M and deposited the check into the same account on which it was drawn. The funds in the account at that time were insufficient to pay the item. Upon hearing of the overbilling arrangements from respondent's agents, the Michases did not immediately do anything as they wanted to proceed slowly after first thinking about what had happened. After about a month, the Michases raised the issue with petitioner who responded there was a mistake, respondent's agents were wrong, and he would straighten everything out. At this time, petitioner did not admit to having money from rebates in his personal account. Although the Michases asked petitioner to return the money on numerous occasions, this was not done.In May of 1977, the Michases threatened petitioner with a lawsuit if the funds were not restored. *563 After discussions among the Michases, their attorney and accountant and petitioner, petitioner repaid the full $75,000.00 to D&M plus $22,500.00 in interest. At the same time, the partners entered into a written partnership agreement which gave direction and control of D&M's books, records, and affairs to the Michases. The $75,000.00 plus interest paid by petitioner to D&M was distributed in equal shares to petitioner and his partners. After 1974, D&M continued to develop the Shorewood property. After completion of phase two in November 1974, the partners contributed all funds expended to make further improvements to the property and no further loans were taken out for this purpose. D&M completed development of the project by the end of 1976. Petitioner and the Michases remained together in the D&M partnership until late in 1981 when petitioner sold his interest in D&M to the Michases in order to raise needed cash. Respondent determined that the rebates received by petitioner from the subcontractors in 1972 and 1974 were wrongfully withheld from D&M and constituted additional income to petitioners in those years. Respondent also determined the resulting underpayment of *564 tax for those years was due to negligence or an intentional disregard to rules and regulations, thereby subjecting petitioners to additions to tax. Petitioners claim these funds were not income, but rather the proceeds of loans which were not wrongfully withheld from D&M. Petitioners filed an amended Federal income tax return for 1977, treating the repayment of the rebates to D&M in 1977 as a return of an item to which petitioner had an unrestricted claim of right within the provisions of section 1341. Respondent determined that section 1341 relief was not available to petitioners because the rebates were never claimed as income under an unrestricted claim of right. Respondent would allow the payment in 1977 as a deduction under section 165(c)(2). OPINION We must first determine whether the rebated overbillings in 1972 and 1974 constituted income to petitioners. Petitioners have the burden of proving that the rebates were not income. Welch v. Helvering,290 U.S. 111 (1933); Fox v. Commissioner,61 T.C. 704, 711-712 (1974); Rule 142, Tax Court Rules *565 of Practice and Procedure.
Respondent determined that petitioners had income through the embezzlement of D&M property. It is beyond question that amounts embezzled by a taxpayer constitute taxable income. James v. United States,366 U.S. 213 (1961). The key elements in a determination of income are (1) the receipt of money by the taxpayer without the consensual recognition of an obligation to repay and (2) the absence of any restriction as to the disposition of the money. James v. United States,supra at 219; Mais v. Commissioner,51 T.C. 494, 498-499 (1968). Whether the money is received unlawfully or lawfully is irrelevant. James v. United States,supra at 219. Thus, the fact that petitioner embezzled funds from D&M, rather than was entitled to them, is irrelevant. In the instant case, petitioner received and held the rebates, without the consensual recognition of an obligation to repay these sums to D&M. Petitioner claims he planned the rebate scheme to create a contingency fund or reserve to be held *566 for the account of the partnership against the possibility of cost overruns. Petitioner maintains he experienced cost overruns on one of his own, separate projects and wanted to protect himself from a repeat of this problem. However, nothing beyond petitioner's own self-serving testimony suggests any agreement among the partners to create a cost overrun reserve. To the contrary, petitioner's partners were unaware of the rebate scheme in any form until respondent commenced a criminal investigation of the scheme. Furthermore, petitioner's own testimony strongly indicated that the rebate scheme was not originally devised or later implemented as a means of providing a reserve for cost overruns, but rather as a system to extract more money from a lender than would otherwise be lent on a construction project. Under Illinois law, a partner has no right to possess specific partnership property for any purpose other than a partnership purpose unless he has the consent of his partners. Ill. Ann. Stat., ch. 106 1/2, sec. 25(2)(a) (Smith-Hurd 1952 and Supp. 1983-84); Cook v. Lauten,335 Ill. App. 92, 80 N.E.2d 280, 282 (1948). *567 In the instant case, petitioner's partners did not consent to petitioner's possession of the rebates. In fact, they did not know of the rebates until late in 1974, and, thereafter, they made numerous demands for the return of the funds to D&M, nor has petitioner shown that the partnership agreement allowed him to separately possess these funds. Petitioner's cost overrun reserve story is self serving and runs counter to the record in this case. Petitioner did not offer such explanation to respondent's agents when first asked about the rebates. Instead, petitioner denied he received the rebates at all. Later, when confronted by respondent's special agent in a criminal investigation, petitioner admitted he received the rebates but incorrectly assured the agents that his partners knew of the scheme. We are unwilling to attribute these episodes to a faulty memory, as petitioner would have us do. Rather, we find that petitioner did not entertain the idea of creating a reserve against cost overruns in arranging for and receiving the rebates. Petitioner argues that his drawing of a check to the partnership in December of 1974 in the amount of the embezzled funds is evidence of his *568 good intentions and a recognition of an obligation to repay. We do not agree. Petitioner drew the check and immediately deposited the check into the same account on which it was drawn. The account belonged to petitioner. The funds in the account at the time were insufficient to cover the check. The check was never out of the control of petitioner or his bank and never passed through the books or account of D&M. The check was drawn after petitioner admitted the existence of the rebates to respondent's agents and after the Michases learned of the scheme. These acts prove nothing other than a misguided and ineffective attempt by petitioner to legitimatize his earlier criminal activity. Petitioner also claims he made out promissory notes in the amount of the rebates and placed them in the financial files of D&M at a time when he still had care and control of the books and records of D&M. Prior to the trial of this case, the record contains no mention of the existence of any such notes. Petitioner has not convinced us he executed promissory notes in favor of D&M. Lastly, petitioner claims that the fact the Michases remained in partnership with petitioner until late in 1981 demonstrates *569 he did not take the rebates without an obligation to repay them. We refuse to find any direct correlation between the disparate facts of partnership survival and petitioner's embezzlement. Petitioner contends he could not have wrongfully possessed funds of D&M under the circumstances of this case as a matter of Illinois law. Petitioner cites United States v. Achilli,234 F.2d 797 (7th Cir. 1956), affd. on another point, 353 U.S. 373 (1957). In Achilli at 806-808, it was determined that a partner who wrongfully tock funds from a partnership could not be guilty of the crime of embezzlement because under Illinois law a partner could not be guilty of embezzling partnership funds at least until an accounting was demanded and refused. However, it has been the law in Illinois since 1962 that: "It is no defense to a charge of theft of property that the offender has an interest therein, when the owner also has an interest to which the offender is not entitled." Ill. Ann. Stat., ch. 38, sec. 16-4(a) (Smith-Hurd 1977). Petitioner would have us construe the provision *570 so as to exclude relations between a partner and a partnership. However, the comment to this section by the Illinois Joint Committee to revise the Illinois Criminal Code specifically notes that it is meant to apply to any theft of property by a co-owner, including a partner. Consequently, the opinion in Achilli,supra, is outdated by subsequent legislative pronouncement in Illinois for the years in issue and petitioner's argument is without merit. Petitioner argues that his liability to the lenders providing construction loans for the development of the project forecloses the possibility of his realizing taxable income from the rebates. He argues, in effect, that he received the rebates with a corresponding obligation to repay the amounts to the lenders. Such convoluted argument misses the point--any repayment obligation to the lenders is irrelevant to the lack of repayment obligation running from petitioner to the partnership. The rebates were the property of D&M and petitioner had no right to receive and hold those funds for other than a partnership purpose. Petitioner's possession of the rebates was wrongful as against the partnership and he acknowledged no obligation *571 to repay these amounts to the partnership until 1977. This conclusion is not altered by the irrelevant fact that petitioner was liable to repay the entire construction debt to the lenders. The fact that D&M was financed through bank borrowings does not alter the fact that the rebates belonged to D&M. Petitioner claims that, even if we hold that he realized taxable income from the rebates, he could not have realized taxable income on one-third of these amounts as they represent his share possessed of a joint interest in partnership property but does not own any separate part thereof. See Ill. Ann. Stat., ch. 106 1/2, sec. 25(2)(a) (Smith-Hurd 1952 and Supp. 1983-84). Petitioner had no right to possess such property for other than partnership purposes. Petitioner's possession of D&M funds was wrongful and his joint interest therein would not constitute a defense to a criminal charge of theft. Petitioner might have become the rightful owner of one-third of the rebates through partnership distribution, sale, or other event; however, he was not the rightful individual owner of any part of the partnership assets in 1972 or 1974. Based upon the above, we conclude that petitioner *572 received the rebates without the recognition of a consensual obligation to repay and without any restriction as to the disposition of the rebates. Accordingly, petitioners have failed to meet their burden of proving that the rebates were not taxable income to them. Therefore, we hold that all rebates received were taxable income. We now turn to the issue of the addition to tax. Respondent determined that the underpayment of tax was due to negligence or an intentional disregard of rules and regulations and added five percent of the amounts of underpayment under the provisions of section 6653(a)(1). Petitioner bears the burden of proving there was no negligence or intentional disregard of rules and regulations. Rule 142(a), Tax Court Rules of Practice and Procedure. Petitioner disputes this addition, relying on his asserted honest belief that the rebates did not constitute taxable income. We have previously rejected petitioner's arguments that he intended to create a cost overrun reserve or that he was under an obligation to repay the rebated amounts.Upon examination of the evidence, *573 we find that petitioner's sole motive in appropriating the rebated amounts was to increase his own income. His failure to report these funds as income was an attempt to evade taxation, either for its own sake or for the collateral sake of avoiding detection of his illegal scheme by his defrauded lenders or partners. Petitioners have offered no believable argument or evidence to rebut this conclusion which logically stems from our findings of fact in this case. Therefore, petitioners have failed to meet their burden of proof as to this issue and we sustain the application of the five percent addition to tax. We next turn to the issue of whether petitioners may avail themselves of the benefit of section 1341 on their 1977 Federal income tax return. Section 1341 permits an alternative and advantageous computation of tax where a taxpayer restores in one taxable year a substantial amount held under a claim of right and included in gross income during a prior taxable year. In the instant case, petitioners assert their entitlement to use section 1341. Respondent denies this entitlement, but *574 would allow a deduction for restored amounts under section 165(c)(2), relating to losses sustained by individuals.
It is true that petitioners are entitled to a deduction in 1977 upon petitioner's repayment of the rebated amounts to D&M; it is also true that, by virtue of our decision herein, these amounts were properly includable as income of petitioners for the prior taxable years 1972 and 1974; furthermore, it is true that the amounts are "substantial" as that term is used in section 1341. [3] What is in dispute, however, is the requirement that" * * * item[s] [were] included in gross income for a prior taxable year (or years) because it appeared that the taxpayer had an unrestricted right to suchitem[s]." Sec. 1341(a)(1), emphasis added. We have already examined whether petitioners had any claim of right to the rebates. We found petitioner's possession of the rebates was wrongful as against the partnership as he did not hold the funds for a partnership purpose, under the terms of the oral partnership agreement or with the consent of his partners. Therefore, we have concluded *575 that petitioners did not have an unrestricted right to these amounts. Consequently, petitioners may not benefit from the claim of right relief doctrine embodied in section 1341. Yerkie v. Commissioner,67 T.C. 388, 392 (1976). Finally, we address the issue of whether Mrs. Dragatsis is entitled to relief from liability as an innocent spouse under section 6013(e). To qualify for innocent spouse relief, Mrs. Dragatsis must show: (1) income attributable to petitioner was omitted from a joint return; (2) the omitted income was in excess of 25 percent of the amount of gross income stated in the return, (3) in signing the return, Mrs. Dragatsis did not know of, and had no reason to know of, such omission; and (4) taking into account whether Mrs. Dragatsis benefited from the omitted income and all other facts and circumstances, it is inequitable to hold her liable for the deficiency attributable to the omission. Respondent concedes the first, second, and fourth requirement of innocent spouse treatment entitlement. The only dispute is whether Mrs. Dragatsis knew, or had reason *576 to know, of the omission. Petitioners bear the burden of proof as to this issue. Rule 142(a), Tax Court Rules of Practice and Procedure. However, Mrs. Dragatsis herself did not testify at trial, nor did any other evidence bear upon this point. Thus, there is no basis in this record from which we might conclude whether Mrs. Dragatsis did or did not, or should or should not, know of the omission. Mrs. Dragatsis fails in her burden of proof on this issue and cannot, therefore, avail herself of section 6013(e). To reflect the foregoing, Decisions will be entered under Rule 155.
Footnotes
1. Unless otherwise stated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in issue.↩
2. Hereinafter, petitioner Christo M. Dragatsis is referred to as "petitioner"; petitioner Mary J. Dragatsis is referred to as "Mrs. Dragatsis"; use of "petitioners" in the plural refers to both petitioner and Mrs. Dragatsis.↩
3. Sec. 1341(a)(3)↩ requires that the amount of the deduction at issue "exceeds $3,000."