MONROE SWAN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Swan v. Commissioner
Docket No. 23351-83.
United States Tax Court
T.C. Memo 1985-521; 1985 Tax Ct. Memo LEXIS 105; 50 T.C.M. (CCH) 1256; T.C.M. (RIA) 85521; October 7, 1985. Monroe Swan, pro se. Sheldon M. Kay, for the respondent. SWIFT
MEMORANDUM FINDINGS OF FACT AND OPINION SWIFT, Judge: In a statutory notice dated July 14, 1983, [1] respondent determind a deficiency in petitioner's 1978 Federal income tax liability, and additions to tax, as follows: Additions to Tax
Deficiency
Sections 6653(a) [2] 6651(a)
$2,592.40
$298.07
$364.25
*106 Following concessions, the primary issue remaining for decision is whether the value of services provided by summer youth workers employed under a federally funded program but diverted (at least in part) by petitioner to his political campaign constitutes gross income properly taxable to petitioner, and if so, the amount of income with respect thereto chargeable to petitioner. Also at issue herein are additions to tax under sections 6651(a) and 6653(a). FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The pertinent facts are summarized below. Petitioner, Monroe Swan, was a resident of Milwaukee, Wisconsin, at the time the petition herein was filed. Petitioner executed a Form 4868 (Application for Automatic Extension of Time to File U.S. Individual Income *107 Tax Return) for the year 1978, extending the time for filing his 1978 Federal income tax return until June 15, 1979. Petitioner, however, did not actually file his 1978 Federal income tax return until June 19, 1980. From 1972 through 1978, petitioner was a senator in the Wisconsin legislature, representing the Wisconsin sixth legislative district (an area encompassing north central Milwaukee). For the four-and-a-half years preceding his election to the state senate, petitioner was director of the Concentrated Employment Program (CEP) in Milwaukee. The CEP was a federally funded program that attempted to help disadvantaged persons obtain employment. In 1978, petitioner ran for the office of Lieutenant Governor of the State of Wisconsin. Petitioner qualified for the ballot, but lost the election. During the spring and summer of 1978, petitioner maintained a district office at 2210 N. Third Street, Milwaukee, Wisconsin, in connection with his position as a state senator. His office in the building at that address was one of a number of offices in that building for officials representing four different levels of government (namely, Federal, state, county, and city). The office *108 building was referred to as the "Joint Legislative Service Center" (hereinafter referred to as "JLSC"). The rent attributable to petitioner's office and the salary of petitioner's administrative aide, Carole Geary, were paid by the State of Wisconsin. Ms. Geary also served as the unpaid coordinator of various aspects of the JLSC building. Many of the campaign activities conducted in connection with petitioner's campaign for Lieutenant Governor (such as strategy meetings and the production of campaign literature) were conducted out of petitioner's office in the JLSC building, primarily in petitioner's conference room, located to the rear of his main office. The controversy herein arises out of petitioner's participation in a federally funded program to provide summer employment for high school-age youth from low-income families. The program was administered through the Department of Labor pursuant to the Comprehensive Employment Training Act ("CETA"), and was administered locally through a number of organizations, including, among others, the Milwaukee Public School Board and the "Commandos," a Milwaukee youth organization. Under the CETA program, these organizations would place *109 youths in various jobs for the summer, generally with governmental or non-profit organizations. The program provided youths with summer employment for an eight-week period during which time they were expected to work four hours per day, as part of either a morning or afternoon shift. The youths were paid hourly wages equal to the prevailing minimum wage. Petitioner first became involved in the CETA youth employment program in 1976 when he requested that various Federal, state, county, and local government offices located in the JLSC building be designated as summer youth job sites by the Milwaukee School Board. His request was initially denied on the basis that the activities conducted at the government offices in the JLSC building were too political and that there was no adequate assurance that the youths would not be used for improper political purposes. Petitioner then contacted the Chief Clerk of the Wisconsin State Senate, who wrote a letter to the Milwaukee School Board. Subsequently, the various sponsoring agencies reversed their decision and six youths were assigned to one of the offices at the JLSC building (apparently to work in petitioner's office) during the summer *110 of 1976. Six youths also were assigned to offices in the JLSC building during the summer of 1977. In a letter dated May 24, 1978, petitioner requested the Milwaukee Public School Board to assign 10 youths to his office for the summer of 1978. The letter indicated that "the youth will be engaged in clerical, janitorial and field work." The 10 youths requested from the Milwaukee Public School Board and 10 additional youths from the Commandos were assigned to petitioner's office inthe JLSC building for eight weeks during the summer of 1978. Some of the 20 youths assigned to petitioner's office were relatives or friends of petitioner, including his son, Allyn Swan; his nieces, Kimberly, Antoinette, and Lorie Johnson; and his nephew, Everett Swan. Although the sponsoring organizations (namely, the Milwaukee Public School Board and the Commandos) were supposed to send supervisors to petitioner's office periodically to check on the progress of the program and to ensure that the youths were being utilized properly, in fact little or no such supervision occurred. Carole Geary, petitioner's administrative aide, was primarily responsible for the day-to-day activities of the youths assigned *111 to petitioner, but she acted pursuant to the directions of petitioner. Following a grand jury investigation, an indictment was returned against petitioner on July 23, 1980, in the United States District Court for the Eastern District of Wisconsin, charging him with 20 counts of "knowingly and willfully embezzling and misapplying monies subject to a grant under the Comprehensive Employment Training Act in violation of section 665 of Title 18." [3] The indictment charged that petitioner misappropriated the services of the 20 youths assigned to his office during the summer of 1978. The indictment was based on the allegation that petitioner used the youths to perform political activities for him in connection with his campaign for Lieutenant Governor. *112 Following a trial before the Honorable Myron L. Gordon held in October of 1980, petitioner was found guilty of two felonies (with respect to the services of Carolyn Holman and Marilyn Holman) and four misdemeanors (with respect to the services of Allyn Swan, Daphne Greer, Bonita Pyant, and Everett Swan). The other 16 counts were dismissed because the government failed to introduce sufficient specific proof to warrant convictions with respect thereto. United States v. Swan, Docket No. 80-CR-90 (E.D. Wis. Nov. 20, 1980). For each felony conviction, the government was required to prove a misappropriation of services valued at more than $100; for each misdemeanor conviction, the government was required to prove a misappropriation of services with a value of $100 or less. Petitioner's convictions were affirmed by the United States Court of Appeals for the Seventh Circuit. United States v. Swan, No. 80-2720 (7th Cir, filed July 27, 1981). Respondent determined that petitioner was taxable on the entire wages paid to all 20 youths during the summer of 1978. That determination requires us to consider the specific evidence concerning the work performed by each of the 20 youths *113 while employed under the CETA program. Even though the parties stipulated into evidence the entire transcript of petitioner's criminal trial on charges of misappropriating services of the youths and even though additional witnesses were called at the trial herein, the evidence is very confusing and unclear as to what specific work the youths performed during the summer of 1978 and the extent to which their work constituted improper political activities associated with petitioner's campaign for Lieutenant Governor. As previously mentioned, we do know that 14 of the criminal counts against petitioner were dismissed by the district court. With regard to the remaining six counts, petitioner was convicted of four misdemeanors (for misappropriating $100 or less) and two felonies (for misappropriating in excess of $100). Although it would make our fact finding in this case much easier if we simply could track the findings of the district court, [4] that approach is not permissible to us due to the difference between the standard of proof in a criminal proceeding and the standard of proof in a civil tax proceeding it this Court. *114 We first will set forth general findings concerning all of the youths, followed by brief separate findings concerning the activities of each of the youths with respect to whom we have sufficient evidence to make separate findings. Evidence Concerning All of the Youth Workers
Upon arriving at petitioner's office to begin work, the youths were given an orientation conducted by Carole Geary. The orientation consisted of introductions to adult employees at the various offices in the JLSC building, a discussion of what the various offices did and explanations of the different levels of government represented by the offices in the JLSC building. The orientation included instructions as to the proper way to answer telephone calls and to address people in a work environment. The orientation period lasted approximately one week. Because the youths sponsored by the Commandos started one week later than those sponsored by the Milwaukee School Board, the orientation process was repeated for the Commando youth workers and the total orientation period extended over two weeks. Following completion of the orientation, most of the youths were assigned to clean up the basement area *115 of the JLSC building. They refused, however, to do such a menial task and after wasting a few days, they announced that they would not do janitorial work of any kind. Some of the youths did repaint the main lobby area of the JLSC building. In addition to janitorial work, the youths generally were supposed to perform and gain experience in various types of office work such as filing, typing, answering telephones, and working with people. Most of the youths did spend some time filing, typing, and answering telephones in petitioner's office. The youths also spent some time addressing and stuffing envelopes for petitioner in a conference room in the JLSC building. They worked on three different types of correspondence: (1) A general newsletter containing the salutation "Dear Constitution;" (2) a campaign brochure describing petitioner's accomplishments and soliciting support for his campaign for Lieutenant Governor; and (3) a thank-you letter to people who had signed petitioner's nominating petitioner for Lieutenant Governor. On some days, some of the youths were instructed to go to certain food stores in Milwaukee for the purpose of soliciting signatures on nominating petitions *116 for petitioner's campaign for Lieutenant Governor. Transportation for and supervision of these trips were provided by either Robert Swan (petitioner's brother and campaign director at the time) or by Frank Johnson (a janitor in the JLSC building) who, as an unpaid volunteer for petitioner, would take youth workers out in the afternoon after completing his 8 a.m. to 12 noon shift. It is not clear from the record how many youths were involved in this activity, but it would appear that at least six such trips were made, each of which was three to four hours in duration. At petitioner's direction, some of the youths also visited the Milwaukee City Hall to check the official list of registered voters against a list provided by petitioner's office in order to identify which registered voters actually voted in the prior election. This activity apparently involved six youths each day for approximately seven work days, although the individuals changed from day to day. One trip also apparently was made to Madison, Wisconsin, to check voter registration lists in that city. Transportation for and supervision of these trips was provided by Monica Harris and Shirely Sneed, adult employees *117 in petitioner's office. The information that resulted from these trips was used in petitioner's campaign for Lieutenant Governor. Irrespective of the type of activity to which the youths were assigned, they in fact spent much of their time doing nothing or engaging in non-productive and disruptive behavior. Many of the youths spent most of their four-hour shifts arguing with one another, playing radios that they had brought with them at loud levels, and dancing. While this behavior was carried on more frequently by some youths than by others, misbehavior and disruptive activity were a constant problem and continued throughout the time the youths were assigned to petitioner's office. These activities upset Carole Geary, who complained about this behavior repeatedly to petitioner. Petitioner held a meeting with the youths some four to five weeks into the program in which he informed them that their behavior was not acceptable and required substantial improvement. Their behavior did not in fact improve following that meeting. Frustrated and upset with the poor performance of all of the youths, approximately six weeks into the program petitioner ordered Carole Geary to tell all *118 of the youths not to come to work for the last two weeks of the eight-week employment period. Petitioner, however, did not report his early termination of the youths to the sponsoring agencies, and he reported that the youths had worked for those two weeks with the result that they were paid therefor with CETA funds. Findings Concerning Individual Youth Workers
Marilyn Holman
Petitioner was convicted of a felony for misappropriating the services of Marilyn Holman ("Marilyn"). Her misappropriated services were determined to have a value in excess of $100. Marilyn testified at both petitioner's criminal trial and at the trial herein. Marilyn started working one week late and apparently did not participate in the orientation program. She worked two four-hour shifts during her first week to make up for the week she missed. Among other things, Marilyn was assigned to obtain signatures for petitioner's nominating petitions for Lieutenant Governor. Robert Swan, petitioner's brother and campaign manager, took her to two Milwaukee food stores for this purpose. She spent three four-hour shifts carrying out this task. However, on the first day she became discouraged *119 after obtaining only 11 signatures in the first few minutes, and spent the rest of the shift sitting and eating plums which she had purchased at the food store. On each of the next two days she worked the entire four-hour shift and obtained approximately 40 signatures each day. Marilyn also was assigned to address and stuff envelopes with thank-you letters from petitioner to persons who had signed his nominating petitions for Lieutenant Governor. This task took approximately six days. At some point, Marilyn was taken to the Milwaukee City Hall to check voter registration lists to determine who had voted in the prior election and to compare names and addresses with the lists maintained by petitioner's office. She performed this task on four separate days. On one day, Marilyn also apparently was taken to Madison, Wisconsin, to check voter registration lists and to address envelopes. The following day, Marilyn stuffed letters in the envelopes, but the nature and content of the letters is unclear from the record. Marilyn testified that she spent the majority of her time during the summer stuffing and addressing envelopes, and that she did not typing or filing. She answered the *120 phone infrequently. Carolyn Holman
Carolyn Holman ("Carolyn"), who is Marilyn's sister, is the only other youth with respect to whose services petitioner was convicted of a felony. She testified at petitioner's criminal trial, but not at the trial herein. Carolyn's testimony in the criminal trial was substantially similar to Marilyn's. Carolyn testified that she started two weeks late, but made up the time working double shifts. She was sent to local stores to obtain signatures on petitioner's nominating petition on two occasions, for approximately three hours on each occasion. She testified that she went to the Milwaukee City Hall to check voter registration lists on five different four-hour shifts. As did her sister Marilyn, Carolyn testified that she spent the greatest portion of her time stuffing and addressing envelopes. She only answered the phone and filed papers during one afternoon. Allyn Swan
Allyn Swan ("Allyn"), who is petitioner's son, is one of the youth workers with respect to whose services petitioner was convicted of a misdemeanor -- that is, the value of the embezzled services was found not to exceed $100. Allyn testified at both his father's *121 criminal trial and at the trial herein. Allyn testified at the trial herein that the time he spent circulating petitions for his father's campaign for Lieutenant Governor was volunteer time. He testified at petitioner's criminal trial, however, that he did not recall whether he was paid with CETA funds for the time he spent circulating nominating petitions. Allyn also testified at the criminal trial that some of his time as a youth worker was spent cleaning up the JLSC offices, answering telephones, and stuffing envelopes with campaign-related material. Daphne Greer
Daphne Greer ("Daphne") is one of the youth workers with respect to whose services petitioner was convicted of a misdemeanor. She did not testify at the criminal trial, nor at the trial herein. Marilyn testified at both the criminal trial and at the trial herein that Daphne went with her to obtain signatures for petitioner's campaign for Lieutenant Governor. Carolyn testified at the criminal trial that Daphne was one of the youths selected to go to Milwaukee City Hall to check voter registration lists. Bonita Pyant
Bonita Pyant ("Bonita") was one of the four youths with respect to whose services petitioner *122 was convicted of a misdemeanor. In the criminal trial, Marilyn, Carolyn, and Monica Harris all testified that Bonita was one of the youths selected to check voter lists at Milwaukee City Hall. Other than the foregoing, there are no other references to Bonita in the record. Everett A. Swan
Everett A. Swan ("Everett") is the last of the four youths with respect to whose services petitioner was convicted of a misdemeanor. The only evidence with respect to Everett's specific activity as a youth worker is testimony at petitioner's criminal trial by Shirley Sneed, Monica Harris, and Marilyn to the effect that Everett was taken to Milwaukee City Hall for one to one-and-a-half weeks for the purpose of checking voter lists. The Remaining 14 Youth Workers
All 14 criminal counts relating to the services of the remaining 14 youths [5] were dismissed by the district court on the ground that the government failed to introduce proof with sufficient specificity to warrant conviction, even as to the misappropriation of services with a value not in excess of $100 per individual. Other than the general findings set forth above, there is no specific evidence in this case relating to the *123 separate activities of the remaining 14 youths during the summer of 1978. OPINION Gross income, as defined in section 61(a), includes all income from whatever source derived, unless specifically excluded. Sec. 1.61-1(a), Income Tax Regs.[6] In defining gross income, Congress intended to exert the "full measure of its taxing power." Helvering v. clifford,309 U.S. 331, 334 (1940). The key factors in the realization of income are the receipt of money, property, or services without *124 the obligation to repay and without any restriction as to the disposition or utilization of the money or property. James v. United States,366 U.S. 213, 219 (1961); Mais v. Commissioner,51 T.C. 494, 498-499 (1968). It is irrelevant whether the money, property, or services are received lawfully or unlawfully. James v. United States,supra at 219. As we previously have stated with respect to embezzlement of money-- It is beyond question that amounts embezzled by a taxpayer constitute taxable income. James v. United States,366 U.S. 213 (1961). [Dragatsis v. Commissioner,T.C. Memo. 1984-122, 47 T.C.M. 1260 at 1263; 53 P-H Memo T.C. par. 84,122 at 436.] That proposition applies equally to the embezzlement or misappropriation of property and services. Accordingly, the key issues for decision herein are whether petitioner embezzled or misappropriated for his personal benefit the services of the summer youth workers and, if so, the value of the services embezzled or misappropriated. We find (as did the Federal district court) that petitioner embezzled or misappropriated a *125 portion of the services of the summer youth workers. Over the course of the first six weeks of the youth placement program, petitioner directed that a number of the youths participate in activities directly related to his personal political campaign for Lieutenant Governor of the State of Wisconsin. Participation in such political activity by the youths was a violation of Federal law and constituted the conversion by petitioner of those services to his personal benefit. The fact that petitioner, in part, may have been motivated by a desire to assign the youths more interesting and challenging work than cleaning up the basement of the building and by a need simply to get the disruptive youths out of his office, is not controlling. At least in part, the services of the youths were misappropriated to petitioner's personal benefit. To that extent and based upon the value thereof, petitioner realized taxable income. The more difficult issue in this case pertains to what portion of the services of the youths was related to work within the scope of the CETA program and what portion of that services was related to petitioner's political campaign.It is only the value of the latter portion *126 that results in taxable income to petitioner. Respondent's deficiency determination and his position herein treats the entire wages paid to the youths under the CETA program in the summer of 1978 as taxable income to petitioner, apparently on the premise that all of the time and services for which the youths were paid were misappropriated by petitioner. That position is directly contrary to the evidence herein that a substantial portion of the services rendered by the youths did not relate to petitioner's campaign for Lieutenant Governor and was office-related work within the scope of the CETA program. It is also generally inconsistent with the holding of the Federal district court which, in a criminal context, found that petitioner only misappropriated services of the youths with a value in excess of $100 in two instances and services with a value not in excess of $100 in four instances. Based upon our evaluation of the evidence in this case and taking into account the burden of proof which is on petitioner in this proceeding, we conclude that the following percentages of the services of each youth were misappropriated by petitioner: Percentage
of Services
Name
Misappropriated
Marilyn Holman
50%
Carolyn Holman
50%
Allyn Swan
35%
Daphne Greer
35%
Bonita Pyant
35%
Everett Swan
35%
Robert Swan, Jr.
20%
Revita Walls
20%
Debra Walls
20%
Alvis Rodgers
20%
Kimberly Johnson
20%
Vonnie Darby
20%
Phillip Washington
20%
Kenneth Greer
20%
Finette Howard
20%
Marsha Howard
20%
Sharon Howard
20%
Antionette Johnson
20%
Lorie Johnson
20%
Kevin Reed
20%
*127 These findings are based upon all of the evidence in this case, particularly the evidence which establishes that during a substantial portion of the six weeks they were on the job the youths did not perform services in connection with petitioner's political campaign. Painting the lobby of the JLSC building, answering phones, filing, and addressing letters to constituents are services that were performed by the youths that were within the scope of the CETA- funded program, and it would be improper to charge petitioner with income with respect to those services. A significant portion of the time the youth workers were supposed to be working, they were disobedient and unruly. The sponsoring organizations of the teenage youths, to a degree, surely must have anticipated such conduct, and by virtue of their lack of supervision and failure to monitor the activities of the youths, the sponsoring organizations can be regarded as condoning such unproductive activities. Clearly, it would be incorrect to charge petitioner with income with respect to the time wasted by the youths and to the disruptive behavior that occurred against petitioner's wishes and in spite of his efforts and those *128 of his staff to keep the youths under control. We next turn to the question of how to value the portion of the services of the youths that we have determined was misappropriated by petitioner. When income is received in the form of services, the amount of income received with respect thereto is measured by the money paid therefor, or if payment for the services takes the form of property or other services, by the fair market value of the property or other services paid therefor. Sec. 1.61-2(d)(1), Income Tax Regs.[7]
In this case, the youths received cash wages in payment for their summer "work." The wages were paid with CETA funds through the sponsoring organizations. Accordingly, the value of the services of *129 the youths is to be measured herein by the amount of wages the youths received during the eight weeks of the summer of 1978 in connection with their assignment to petitioner's office in the JLSC building. Set forth below is a schedule of the total wages paid to each youth and the portion thereof that represents income chargeable to petitioner based upon our prior findings herein as to the percentage of the services performed by each youth that was related to petitioner's campaign for Lieutenant Governor: Total
Percentage of
Income
Wages
Services
Chargeable
Name
Received
Misappropriated
to Petitioner
Marilyn Holman
$466.40
50%
$ 233.20
Carolyn Holman
459.80
50%
229.90
Allyn Swan
459.80
35%
160.93
Daphne Greer
466.40
35%
163.24
Bonita Pyant
466.40
35%
163.24
Everett Swan
[8] 1,120.00
35%
392.00
Robert Swan
459.80
20%
91.96
Revita Walls
459.80
20%
91.96
Debra Walls
459.80
20%
91.96
Alvis Rodgers
459.80
20%
91.96
Kimberly Johnson
347.15
20%
69.43
Vonnie Darby
351.12
20%
70.22
Phillip Washington
341.85
20%
68.37
Kenneth Greer
453.15
20%
90.63
Finette Howard
466.40
20%
93.28
Marsha Howard
466.40
20%
93.28
Sharon Howard
466.40
20%
93.28
Antionette Johnson
429.30
20%
85.86
Lorie Johnson
461.10
20%
92.22
Kevin Reed
466.40
20%
93.28
Total income to be charged to Petitioner
$2,560.20
*130 The next issue for consideration is the applicability of the addition to tax under section 6651(a) for failure to timely file his 1978 federal income tax return. Petitioner bears the burden or proving that his failure to timely file was due to reasonable cause and not to willful neglect. Kindred v. Commissioner,669 F.2d 400 (6th Cir. 1982), affg. a Memorandum Opinion of this Court; Rule 142(a). The only explanation offered by petitioner for filing his 1978 return over a year late is that he was waiting to file the return until after Congress resolved the issue of the deductibility of a state legislator's per diem allowance. We find that petitioner's explanation does not constitute reasonable cause, and we find for respondent on this issue. Finally, we consider whether petitioner is liable for *131 the addition to tax under section 6653(a) for negligence or intentional disregard of rules and regulations. Such a determination by respondent is presumed correct, and petitioner has the burden of showing that he exercised due care. Bunnel v. Commissioner,50 T.C. 837, 843 (1968). It is clear from the evidence that petitioner did not appreciate the fact that the misappropriated youth services would constitute taxable income to him. In large part, petitioner was motivated by the good faith desire simply to keep the youths off the street and, after they became unruly in his office, to give them something meaningful to do out of his office. Under the circumstances of this case we do not find that petitioner was negligent or that he intentionally disregarded the rules and regulations in failing to report as his taxable income the income attributable to the personal benefit he received from the services of the youth workers. Accordingly, we find that petitioner is not liable for the addition to tax under section 6653(a). In accordance with the foregoing resolution of the issues, Decision will be entered under Rule 155.
Footnotes
1. Although not entirely clear from the record, petitioner apparently executed a Form 872 to extend the statute of limitations on assessment to June 30, 1984. ↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended, and in effect during the year in issue and all rule references are to the Tax Court Rules of Practice and Procedure.↩
3. 18 U.S.C. § 665(a) (1976) provides: (a) Whoever, being an officer, director, agent, or employee of, or connected in any capacity with, any agency receiving financial assistance under the Comprehensive Employment and Training Act of 1973 embezzles, willfully misapplies, steals, or obtains by fraud any of the moneys, funds, assets, or property which are the subject of a grant or contract of assistance pursuant to this Act shall be fined not more than $10,000 or imprisoned for not more than two years, or both; but if the amount so embezzled, misapplied, stolen, or obtained by fraud does not exceed $100, he shall be fined not more than $1,000, or imprisoned not more than one year, or both.↩
4. Under such an approach we could simply find that (1) with regard to 14 youth workers, no misappropriation occurred, (2) with regard to four youth workers a misappropriation occurred but in amounts which did not exceed $100, and (3) with regard only to two youth workers could we find that a misappropriation occurred in excess of $100.↩
5. Namely, Robert Swan, Jr., Revita Walls, Debra Walls, Alvis Rodgers, Kimberly Johnson, Vonnie Darby, Phillip Washington, Kenneth Greer, Finette Howard, Marsha Howard, Sharon Howard, Antionette Johnson, Lorie Johnson, and Kevin Reed.↩
6. Section 1.61-1(a), Income Tax Regs., in pertinent part, provides as follows: Sec. 1.61-1. Gross Income. (a) General definition. Gross income means all income from whatever source derived, unless excluded by law. Gross income includes income realized in any form, whether in money, property, or services. Income may be realized, therefore, in the form of services, meals, accommodations, stock, or other property, as well as in cash. * * *↩
7. Section 1.61-2(d)(1) provides in pertinent part as follows: (d) Compensation paid other than in cash. (1) In general. Except as otherwise provided * * * if services are paid for in property, the fair market value of the property taken in payment must be included in income as compensation. If services are paid for in exchange for other services, the fair market value of such other services taken in payment must be included in income as compensation. * * *↩
8. The $1,120 which the parties have stipulated was paid to Everett Swan appears to be incorrect in light of the amounts paid to the other youths. The parties are instructed to recompute the income chargeable to petitioner with respect to the total actual wages paid to Everett Swan under the CETA program to the extent that such total wages were less than $1,120.↩